# STATE OF HAWAII, Plaintiff-Appellee, *v.* JAMES H. J. ESTRADA, Defendant-Appellant

## NO. 11377

(CRIMINAL NO. 85-0280(3))

JUNE 8, 1987

LUM, C.J., NAKAMURA, PADGETT, HAYASHI, JJ., AND
INTERMEDIATE COURT OF APPEALS CHIEF JUDGE JAMES S. BURNS,
IN PLACE OF WAKATSUKI, J., EXCUSED

## OPINION OF THE COURT BY HAYASHI, J.

Defendant-Appellant James H. J. Estrada (hereinafter "Estrada") appeals his attempted murder conviction and life sentence without the possibility of parole for the shooting of Maui County Police Officer Keith Taguma (hereinafter "Officer Taguma"). Estrada had claimed shooting Officer Taguma in self-defense accidentally after the latter had become violent. Circuit Judge Boyd P. Mossman (hereinafter "Judge Mossman") presided over the jury trial. Estrada raises as reversible errors 1) the denial of trial continuances to investigate relevant reports of Officer Taguma's prior violent acts and abuse of police powers; 2) the rulings restricting discovery of Officer Taguma's past bad acts, employment history, plus medical records; 3) the rulings barring the admission of evidence that Officer Taguma had misused his police powers, physically abused his then-girlfriend, and lied on his employment application forms for the Maui Police Department (hereinafter "MPD"); 4) the jury's receipt of prejudicial evidence relating to his (Estrada's) unrelated burglary arrest; 5) the rulings on expert medical witnesses; 6) the self-defense instructions read to the jury; 7) Judge Mossman's a) entering the jury room to personally answer the jurors' questions, and b) not adequately responding to their questions; and 8) the imposition of the life sentence without the possibility of parole. For the following reasons, we vacate the sentence, reverse the guilty conviction, and remand the case for a new trial.

## I.

## A.

*FACTS RELATING TO THE SHOOTING.*

The preliminary facts are not disputed. Officer Taguma was a receiving desk officer working the night shift at the Wailuku, Maui police station. In the early morning hours of June 29, 1985, he was assigned to get breakfast for some other police officers from the Kahului Burger King restaurant. Officer Taguma was in uniform and drove a marked police van. While returning from the Burger King, Officer Taguma stopped the car driven by Estrada. Bayani Gamit (hereinafter "Gamit") was Estrada's passenger. Both vehicles parked in the Kentucky Fried Chicken restaurant parking lot. Officer Taguma and Estrada got into a fight, Officer Taguma was shot with his own gun, and Estrada fled. Later that day, Estrada surrendered. Officer Taguma was treated for severe abdominal injuries at Queen's Medical Center hospital (hereinafter "Queen's Hospital").

Officer Taguma later testified he had stopped Estrada's car because of erratic driving and claimed he was legitimately investigating possible drunk driving. After discovering that Estrada had no driver's license and possessed indicia of alcohol consumption, Officer Taguma ordered Estrada and Gamit out of the car, reached into the car to retrieve an open beer can, then found a pouch containing ammunition. Without warning, Estrada began striking Officer Taguma and yelling that the latter had no right to search the car. Officer Taguma retreated back to the police van, Estrada pursued to continue the attack, a struggle ensued over Officer Taguma's gun, and Estrada shot Officer Taguma.

Estrada, however, denied any bad driving or drinking that night. He further testified that Officer Taguma had never requested a driver's license but had found a beer can in the car. After Estrada questioned the warrantless search, Officer Taguma became enraged, said "I can do what I want because I am a policeman[,]" Transcript, January 27, 1986 at 110, assaulted Estrada (who did not resist), stepped back, and pulled out the gun to aim at Estrada. Fearful of being shot, Estrada rushed at Officer

Taguma to prevent any shooting, both men scuffled, and the gun fired.

## B.

### *FACTS RELATING TO THE TRIAL PROCEEDINGS.*

On July 5, 1985, Estrada was indicted for attempted murder.[1] Beginning on July 12, 1985, defense counsel David Bettencourt (hereinafter "Bettencourt") sought disclosure of 1) all of Officer Taguma's personnel records and complaints against him while a Honolulu Police Department (hereinafter "HPD") officer and a Maui airport security guard; 2) all of Officer Taguma's medical records; and 3) any favorable evidence as defined by Hawaii Rules of Penal Procedure (hereinafter "HRPP") Rule 16(b).[2] After ini-

---

[1] The relevant statutes read:

§ *705-500 Criminal attempt.* (1) A person is guilty of an attempt to commit a crime if he:

    (a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as he believes them to be; or

    (b) Intentionally engages in conduct which, under the circumstances as he believes them to be, constitutes a substantial step in a course of conduct intended to culminate in his commission of the crime.

(2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, he intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.

(3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

§ *707-701 Murder.* (1) Except as provided in section 707-702, a person commits the offense of murder if he intentionally or knowingly causes the death of another person.

(2) Murder is a class A felony for which the defendant shall be sentenced to imprisonment as provided in section 706-606.

[2] HRPP Rule 16(b) reads in relevant part:

(1) *Disclosure Upon Written Request of Matters Within Prosecution's Possession.* Upon written request of defense counsel, the prosecutor shall disclose to him the following material and information within the prosecutor's possession or control:

    (i) the names and last known addresses of persons whom the prosecutor intends to call as witnesses, in the presentation of the evidence in chief, together with their relevant written or recorded statements, provided that statements recorded by the prosecutor shall not be subject to disclosure;

tially opposing the discovery request as too broad and seeking confidential or irrelevant evidence, Plaintiff-Appellee State of Hawaii (hereinafter "State") reluctantly provided discovery.

On January 6, 1986, just before the start of jury *voir dire*, Bettencourt orally moved to continue the trial because of State's tardy disclosure of a police report, involving Officer Taguma's ex-girlfriend Junette L. (hereinafter "Junette"), had prejudiced the defense. She had been romantically involved with Officer Taguma from 1979 to 1984 (including living with him intermittently between 1982 and 1984) but had broken up with him because of alleged physical abuse. On April 3, 1985, she had filed a complaint against Officer Taguma for harassing her and her then-fiancé

---

(iii) any reports or statements of experts, which were made in connection with the particular case or which the prosecutor intends to introduce, or which are material to the preparation of the offense and are specifically designated in writing by defense counsel, including results of physical or mental examinations and of scientific tests, experiments, or comparisons;

(iv) any books, papers, documents, photographs, or tangible objects which the prosecutor intends to introduce, or which were obtained from or which belong to the defendant, or which are material to the preparation of the defense and are specifically designated in writing by defense counsel;

(v) any prior criminal record of the defendant.

(2) *Disclosure Without Request of Matters Within Prosecution's Possession.* The prosecutor shall disclose to defense counsel the following material and information within the prosecutor's possession or control:

. . . .

(ii) any material or information which tends to negate the guilt of the defendant as to the offense charged or would tend to reduce his punishment therefor.

(3) *Disclosure of Matters Not Within Prosecution's Possession.* Upon written request of defense counsel and specific designation by him of material or information which would be discoverable if in the possession or control of the prosecutor and which is in the possession or control of other governmental personnel, the prosecutor shall use diligent good faith efforts to cause such material or information to be made available to defense counsel; and if the prosecutor's efforts are unsuccessful the court shall issue suitable subpoenas or orders to cause such material or information to be made available to defense counsel.

(4) The term "statement" as used in subsection (b) (1)(i) and (c) (2) (i) of this rule means:

(i) a written statement made by the witness and signed or otherwise adopted or approved by him; or

(ii) A stenographic, mechanical, electrical or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by the witness and recorded contemporaneously with the making of such oral statement.

(now husband) Stephen H. (hereinafter "Stephen").[3] Specifically, she had charged that Officer Taguma 1) had beaten her several times prior to and during August 1983; and 2) would often use his police authority to pull over Stephen's car. Her allegations were listed in a report prepared by MPD Officer Ramsey Anakalea (hereinafter "the Anakalea Report") on August 28, 1985. Although the Anakalea Report had been given to Bettencourt on December 22, 1985, he complained State's dilatory tactics had made it impossible to prepare the defense. Bettencourt also argued that, although Junette had been initially willing to talk with him, she had later refused to testify, unless subpoenaed, after State had contacted her (the record reflects only that State had contacted her, not what was said). Judge Mossman denied the continuance request ruling adequate time to prepare the defense had existed.

On January 9, 1986, prior to allowing Junette to take the stand during trial, Judge Mossman conducted an *in limine* hearing to determine the relevancy of her testimony. At this time, she revealed the existence of another report against Officer Taguma prepared by the Maui Prosecutor's Office Victim-Witness Counselor Dr. Brian Ogawa (hereinafter "the Ogawa Report") on September 16, 1985. State had not disclosed the Ogawa Report. Junette subsequently recanted or qualified most of her earlier accusations, but Bettencourt again orally moved for a continuance citing the necessity to have time to review and investigate the Ogawa Report. Judge Mossman denied the continuance motion, held both the Anakalea and Ogawa Reports inadmissible, and barred Junette from testifying at trial. Judge Mossman ruled that Junette's charges had been exaggerated, were not relevant, or alternatively, even if they were relevant, their probative value would be substantially outweighed by the dangers of unfair prejudice, confusion of the issues, or waste of time.

Bettencourt also sought discovery of a confidential HPD Internal Affairs Division (hereinafter "IAD") file on Officer Taguma and testing materials used by psychologist Dr. Harold Hall (hereinafter "Dr. Hall") to evaluate Officer Taguma and Estrada. The

---

[3] On June 29, 1985, the day of the shooting, Junette was supposed to marry Stephen. Upon hearing of the shooting, Junette's first thoughts were that Officer Taguma, still upset over their break-up, may have provoked Estrada. Record Volume II at 395.

IAD file allegedly contained information that Officer Taguma had been forced to resign from HPD for misconduct and violation of regulations. Bettencourt also asserted that the IAD file would show that Officer Taguma had lied on applying for employment with MPD by not revealing the true reasons for leaving HPD (Officer Taguma had written about wanting to move to Maui as the reason for resigning from HPD). After an *in camera* review, Judge Mossman ruled the IAD file plus Dr. Hall's materials were irrelevant and sealed them. Neither the defense nor State knew the contents of either item.

Officer Taguma then testified. During Officer Taguma's cross-examination, Judge Mossman prohibited inquiry into whether Officer Taguma would file a civil lawsuit against Estrada after the outcome of the criminal trial. Bettencourt, though, made Officer Taguma admit contacting a civil attorney (after the guilty verdict issued, Officer Taguma did file suit). Various other prosecution witnesses testified about Officer Taguma's injuries and the evidence indicating guilt.

Estrada first testified for the defense. Among the more significant defense witnesses, James Glasgow (hereinafter "Glasgow"), who was in custody on June 1, 1985 for drunken driving offenses, stated Officer Taguma had brutally assaulted him. Verna Inouye (hereinafter "Inouye") said Officer Taguma, while a Kahului, Maui airport security guard, had screamed at and threatened her for a minor parking violation in November 1984. Physician Dr. Peter Halford (hereinafter "Dr. Halford"), who had treated Officer Taguma at Queen's Hospital, observed Officer Taguma was habitually angry, verbally abusive, and had mental problems. Gamit refused to testify.

Judge Mossman, however, excluded the testimony of Officer Taguma's former employers, Thomas Higa (hereinafter "Higa") of Longs Drugs store and Francis Kamakawiwaole (hereinafter "Kamakawiwaole"), security chief of the Sheraton-Maui Hotel. Both ex-employers would have stated that Officer Taguma had "an attitude problem" while Kamakawiwaole added that Officer Taguma was a "pit bull." Judge Mossman also prevented bar hostess Maryanne M. (hereinafter "Maryanne") from taking the stand. She would have testified that Officer Taguma, while a Maui County liquor control inspector, had sexually harassed her, grab-

bed her breasts, and threatened to use his official powers to have her fired unless she had sexual relations with him. Judge Mossman ruled such evidence irrelevant to Estrada's self-defense claims. Judge Mossman finally barred the testimony of psychiatrist Dr. Ned Murphy (hereinafter "Dr. Murphy") of Queen's Hospital. Dr. Murphy would have testified that Officer Taguma's bad behavior during recovery could not be explained by post-traumatic stress disorder (hereinafter "PTSD") but was due to preexisting character problems. Judge Mossman held this conclusion inadmissible because Dr. Murphy could not state with reasonable medical certainty that Officer Taguma had any propensity for violence or aggression.

On rebuttal, Dr. Hall testified that Officer Taguma's unruly actions at Queen's Hospital were caused by normal PTSD and not by any behavior problem. Other rebuttal witnesses also refuted the defense witnesses' testimony. The jury then retired for deliberations on February 4, 1986.

During deliberations, the jury asked for the self-defense instructions and Officer Taguma's plus Dr. Halford's testimony on Officer Taguma's behavior at Queen's Hospital prior to release. As per his usual custom, Judge Mossman thereupon entered the jury room with a court reporter (to transcribe the proceedings) and a bailiff. Judge Mossman then read some, but not all, of the self-defense instructions, gave the jury a complete written set of all the jury instructions, and reread Officer Taguma's testimony, but not Dr. Halford's testimony. Judge Mossman entered the jury room three separate times.

On February 7, 1986, Circuit Judge Richard R. Komo, substituting for Judge Mossman, accepted the jury's guilty verdict. State then moved for the imposition of life sentence without the possibility of parole pursuant to Hawaii Revised Statutes (hereinafter "HRS") § 706-606.1(1) (a) (1985).[4] State argued Estrada had

---

[4] HRS § 706-606.1(1) (a) reads in relevant part:

*Sentence for offense of attempted murder.* The court shall sentence a person who has been convicted of attempted murder to an indeterminate term of imprisonment. In such cases the court shall impose the maximum length of imprisonment as follows:

    (1) Life imprisonment without possibility of parole in the attempted murder of:

      (a) A peace officer while in the performance of his duties . . . .

been convicted for the attempted murder of a police officer who was acting in the line of duty. Bettencourt disagreed contending that, since State had never charged the HRS § 706-606.1(1) (a) violation in the complaint nor had the jury made the factual determination that Officer Taguma was acting in the performance of duty when shot, Estrada had no notice about the enhanced sentencing in contravention of due process. A sentencing hearing was set for April 3, 1986.

At the sentencing hearing, Bettencourt additionally complained that, unknown to the defense, 1) the jury had received Estrada's prejudicial fingerprint exemplar of a prior unrelated burglary arrest (for which Estrada had been later acquitted); and 2) Judge Mossman had directly communicated with the jurors by improper means.[5] Judge Mossman then ruled that Bettencourt had known of yet had not objected to the practice of entering the jury room and HRS § 706-606.1(1) (a) applied. Estrada was consequently sentenced to life imprisonment without the possibility of parole (though, after twenty years of imprisonment, commutation of the sentence to life with the possibility of parole could occur).

This appeal followed.

## II.

### QUESTIONS PRESENTED.

Because of the many issues presented by this appeal, we will address them in the following order:

1. Whether Judge Mossman abused his discretion by denying the trial continuances to investigate the Anakalea and Ogawa Reports? YES.

2. Whether Judge Mossman abused his discretion by denying discovery of A) the IAD file on Officer Taguma; and B) Dr. Hall's testing materials? YES as to the former, NO as to the latter.

---

[5] Bettencourt also raised these objections in a motion for new trial filed on April 3, 1986, after the sentencing hearing. The court minutes reflect that this motion was never decided and was stricken on April 15, 1986. Since this motion was not filed within ten days after the guilty verdict issued, however, it was untimely under HRPP Rule 33, so Judge Mossman lacked the jurisdiction to decide the new trial request. *State v. Meafou,* 67 Haw. 41, 677 P.2d 459 (1984).

3. Whether Judge Mossman abused his discretion by excluding evidence regarding Officer Taguma's A) prior bad acts; B) falsification of his MPD employment application forms; and C) contemplated civil suit (i.e., bias) against Estrada? YES as to all three.

4. Whether the introduction to the jury of Estrada's unrelated burglary arrest constituted reversible error? YES.

5. Whether Judge Mossman abused his discretion by excluding Dr. Murphy's testimony while admitting Dr. Hall's testimony? YES.

6. Whether Judge Mossman erred in rereading the self-defense jury instructions? NO.

7. Whether Judge Mossman erred by A) entering the jury room; and B) rereading only Officer Taguma's testimony though the jury had also requested Dr. Halford's testimony? YES as to both.

8. Whether Judge Mossman erred by applying HRS § 706-606.1(1)(a)? YES.

### III.

### *DENIAL OF CONTINUANCES.*

Estrada maintains that the continuances were needed to investigate the veracity of Junette's charges in the Anakalea and Ogawa Reports to determine if Officer Taguma had been physically abusive and had misused his police powers to harass her and Stephen. Estrada asserts that these instances of misconduct are relevant to show Officer Taguma 1) had a propensity for violence and the improper use of police powers; and 2) was the original aggressor. State counters that Judge Mossman's later rulings, that Junette's testimony plus both Reports were not relevant (which are not challenged in Estrada's points of appeal), indicate no error occurred.

Judge Mossman had the discretion to deny the continuances, *State v. Altergott*, 57 Haw. 492, 559 P.2d 728 (1977), and to exclude irrelevant or wasteful, time-consuming testimony. *State v. Matias*, 57 Haw. 96, 550 P.2d 900 (1976). Even relevant "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or

needless presentation of cumulative evidence." Hawaii Rules of Evidence (hereinafter "HRE") Rule 403.

Officer Taguma's prior bad acts which indicate a propensity for violence, aggression, or abuse of police powers, however, were highly relevant to Estrada's self-defense claims. *Meyer v. City and County of Honolulu,* 69 Haw. ___, 731 P.2d 149 (1986) (instances of police officers' wrongdoing are admissible to establish the original aggressor). HRE Rule 404 provides in relevant part (emphasis added):

> *Character evidence not admissible to prove conduct; exceptions; other crimes.* (a) Character evidence generally. Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion, except:
>
> .   .   .   .
>
> (2) *Character of victim.* Evidence of a pertinent trait of character of the victim of the crime *offered by an accused,* or by the prosecution to rebut the same, or evidence of a character trait of peacefulness of the victim offered by the prosecution in a homicide case to rebut evidence that the victim was the first aggressor . . . .

Judge Mossman therefore erred in declaring that Junette's charges in the Reports were not relevant. *See State v. Burkhart,* 5 Haw. App. 26, 675 P.2d 811 (1984).

That error was compounded by State's apparent violation of the HRPP Rule 16(b) mandate to timely furnish complete discovery. *See* note 2, *supra.* The Anakalea Report was provided just over two weeks before the commencement of trial on January 6, 1986 although prepared in August 1985. The HRPP Rule 16(b) violation with regards to the Ogawa Report is more egregious: had Junette not mentioned the Ogawa Report on January 9, 1986, Bettencourt would never have known of it. State's conduct is inexcusable given that the Ogawa Report was prepared on September 16, 1985, some two months after Bettencourt requested discovery. Prosecutorial suppression of favorable material evidence violates due process, regardless of any good faith or bad faith by State. *State v. Marzo,* 64 Haw. 395, 641 P.2d 1338 (1982).

Here, Bettencourt had little opportunity to investigate the Anakalea and Ogawa Reports to prepare the defense. Judge Mossman, moreover, made no inquiry regarding the reasons for State's failure to comply with HRPP Rule 16(b) or whether any prejudice resulted from State's misconduct. *State v. Miller*, 67 Haw. 121, 680 P.2d 251 (1984). It is clear that Judge Mossman should have allowed the trial continuances as an appropriate remedy to cure the harm created by State's unexplained delays in providing discovery of essential information. *State v. Kaiu*, 5 Haw. App. 350, 692 P.2d 1166 (1984).

IV.

A.

*DISCOVERY OF THE IAD FILE.*

Estrada claims more liberal discovery should have been allowed in face of State's contumacious delays and HRPP Rule 16(b) violations in not disclosing the Anakalea and Ogawa Reports. He asserts the IAD file should have been disclosed for possible relevancy. State responds 1) the IAD file was privileged; and 2) Judge Mossman determined it was not relevant anyway.

No absolute privilege insulates police records from discovery. A trial judge should first conduct an *in camera* review of sensitive police records to fix the scope of discovery on those confidential items sought. *Nakagawa v. Heen*, 58 Haw. 316, 568 P.2d 508 (1977). The scope of discovery is reviewed for an abuse of discretion. *Kaneshiro v. Au*, 67 Haw. 442, 690 P.2d 1304 (1984). Judge Mossman followed the above procedure, declared the IAD file not relevant, and sealed the file for appellate review. We now reverse his decision barring discovery of the IAD file and disclose its contents in brief summary.

The IAD file describes two incidents. The first occurred while Officer Taguma was an HPD recruit (before he formally joined HPD). Officer Taguma allegedly made obscene phone calls to a female acquaintance. Her boyfriend and another male friend attacked Officer Taguma. During the fight, Officer Taguma either claimed he was a police officer or had police officer friends. No

charges resulted from this supposed occurrence. The second, however, is far more serious. Officer Taguma was accused of initiating sexual relations with a prostitute he had arrested in return for promising to testify favorably at her trial. The prostitute notified IAD which conducted an investigation. Officer Taguma denied having sexual relations but admitted 1) not reporting she had tried to bribe him after her arrest; and 2) improperly meeting with her. Based on the IAD report, Officer Taguma was allowed to resign instead of being fired for the serious HPD rule violations (the police officer union, the State of Hawaii Organization of Police Officers, had negotiated this settlement).

The IAD file contents, if true, display a pattern of misconduct, lying, and abuse of police authority predating Officer Taguma's official entry into HPD. Though evidence of prior bad acts is not ordinarily admissible to prove the character of Officer Taguma "to show that he acted in conformity therewith[,]" such evidence is admissible under HRE Rule 404(b) when it is relevant and probative of any fact that is of consequence to the merits of the present case. *State v. Prince,* 67 Haw. 231, 683 P.2d 1217 (1984). The relevant fact here is the controversy over who was the original aggressor under HRE Rule 404(a) (2). *See Feliciano v. City and County of Honolulu,* 62 Haw. 88, 611 P.2d 989 (1980).

We accordingly direct that, on remand, the presiding trial judge shall disclose the entire contents of the IAD file to both sides who shall then have an opportunity to review the evidence and argue which portions should be admitted and which other portions should be excluded. The trial court shall then exercise its discretion in accordance with HRE Rule 403. *See State v. Iaukea,* 56 Haw. 343, 537 P.2d 724 (1975).

### B.

### DISCOVERY OF DR. HALL'S TESTING MATERIALS.

Dr. Hall employed questionnaires to diagnose that Officer Taguma suffered from PTSD. The same arguments made with regard to the IAD file were also made here. Once again, Judge Mossman conducted an *in camera* review, held the items sought irrelevant, and sealed them for appellate review.

We have conducted a thorough inspection of Dr. Hall's materials and agree that they are neither relevant nor admissible under HRE Rules 403 and 404. *See State v. Reyes,* 66 Haw. 613, 670 P.2d 1282 (1983). Dr. Hall's confidential testing materials are questionnaires completed by other persons which he used as foundational items to formulate his opinions. Neither Officer Taguma nor Estrada filled out questionnaires. We fail to discern what discoverable evidence could have been obtained. Estrada was not prejudiced. *Cf. State v. Kutzen,* 67 Haw. 542, 696 P.2d 351 (1985). The testing materials shall remain sealed.

V.

A.

### OFFICER TAGUMA'S PRIOR BAD ACTS.

Estrada asserts that the Anakalea and Ogawa Reports as well as the testimony of Junette, Higa, Kamakawiwaole, plus Maryanne were highly relevant so should not have been excluded. State counters that the proffered evidence was 1) irrelevant; or 2) cumulative since defense witnesses Glasgow, Inouye, and Dr. Halford had already testified as to Officer Taguma's violent and abusive nature.[6]

We have already ruled that Junette's testimony plus the Anakalea and Ogawa Reports are relevant so should have been admitted. The jury, as sole judge of witness credibility and the weight of the evidence, must determine the veracity of Junette's allegations as they relate to Estrada's self-defense claims. *State v. Riveira,* 59 Haw. 148, 577 P.2d 793 (1978).

Higa's and Kamakawiwaole's testimony, though, were not relevant. Officer Taguma's supposed "attitude problem," without any

---

[6] No transcripts for the offers of proof of Higa, Kamakawiwaole, and Maryanne are in the record. Bettencourt concedes no record exists for the offers of proof and attaches photocopies of the offers of proof as appendices to the opening brief. State argues against allowing Bettencourt to present this issue since he failed to provide a record indicating what was presented to Judge Mossman and what the bases of Judge Mossman's rulings barring the testimony of Higa, Kamakawiwaole, and Maryanne were. *See* HRS § 641-16 (1985). State, however, does not dispute the offers of proof were made as represented in the opening brief appendices, so we will consider this question despite Bettencourt's errors.

specific instances of violence, aggression, or abuse of official powers, did not relate to Estrada's self-defense claims. *See* HRE Rule 404(b).

Maryanne's testimony, however, clearly is relevant by showing Officer Taguma, as a Maui County liquor control officer, was physically aggressive, sexually harassed her, assaulted her, and abused the powers of his office for personal gain. *See State v. Lui,* 61 Haw. 328, 603 P.2d 151 (1979). Accordingly, her testimony should have been admitted as consistent with Glasgow's and Inouye's accounts of Officer Taguma's misconduct. *See State v. Basque,* 66 Haw. 510, 666 P.2d 599 (1983).

### B.

#### *OFFICER TAGUMA'S FALSIFICATIONS.*

Estrada contends that Officer Taguma's failure to reveal the true nature of his forced resignation from HPD on his application for employment with MPD adversely affects credibility so should have been revealed to the jury. Estrada also raises Officer Taguma's concealment of the true reasons why Junette left him. State replies that Officer Taguma committed no lies under oath but merely characterized his 1) leaving HPD as a desire to move to Maui and resume his police career; and 2) break-up with Junette as a decision to have his police career assume top priority in his life.

We conclude that Officer Taguma's alleged falsifications were relevant towards a determination of his credibility. The jury should possess all relevant evidence that Officer Taguma may have lied to obtain and keep his current job. *Cf. Bagley v. Lumpkin,* 798 F.2d 1297 (9th Cir. 1986). It is for the jury to decide how much weight to give to the falsifications. *See State v. Bogdanoff,* 59 Haw. 603, 585 P.2d 602 (1978). The apparent falsification should have been admitted under the guidelines established in HRE Rule 608(b).

### C.

#### *OFFICER TAGUMA'S BIAS AGAINST ESTRADA.*

Estrada argues that Officer Taguma's bias in the outcome of the case (using a guilty verdict to file a civil negligence action) should

have been revealed. State responds any error in excluding Officer Taguma's bias was harmless since Bettencourt elicited Officer Taguma's admission that a civil attorney was working on a contemplated lawsuit against Estrada.

Bias, interest, or motive is always relevant under HRE Rule 609.1. So long as a proper foundation is laid, bias can be raised at any time by the witness's testimony or other evidence. *State v. Murphy*, 59 Haw. 1, 575 P.2d 448 (1978). A criminal conviction can be used as evidence in a civil suit, and it is error not to allow cross-examination to reveal possible bias. *State v. Liuafi*, 1 Haw. App. 625, 623 P.2d 1271 (1981).

The error in this case was harmless because the bias was brought out. As a practical matter, moreover, Officer Taguma's bias against the man who shot him is obvious. *State v. Gonsalves*, 5 Haw. App. 659, 706 P.2d 1333 (1985). Needless to say, on remand, however, evidence of Officer Taguma's bias should be admitted if offered.[7]

### VI.

### *EVIDENCE OF ESTRADA'S BURGLARY ARREST.*

Estrada argues that State violated his due process and fair trial rights by essentially sneaking in evidence of an unrelated burglary which the jury did not know he was acquitted of. State counters that Bettencourt had used Estrada's fingerprint exemplar (to cross-examine a prosecution witness), knew it was an exhibit, yet failed to make a timely objection, so waived any error. State also argues the exemplar was mistakenly submitted to the jury, and no prejudice was intended.

Estrada's fingerprint exemplar was part of State's Exhibit 78 (hereinafter "Exhibit 78") titled "Latent Fingerprints of Keith Taguma." What apparently happened is that State's Exhibit 78 was submitted to the jury with neither party realizing that Estrada's

---

[7] Officer Taguma has filed a civil action in the Second Circuit entitled *Taguma v. Estrada*, Civil No. 86-0389. Bettencourt notes that Officer Taguma's complaint avers that Estrada *negligently* fired the gun. This charge is inconsistent with the present case involving an allegation of *intentional* conduct (i.e. attempted murder).

exemplar was also included. Both State and Bettencourt are at fault for not checking Exhibit 78 thoroughly and thereby avoiding this problem. But only if this court concludes beyond a reasonable doubt that the evidence had not contributed to the guilty verdict will the conviction be upheld. *State v. Kahinu,* 53 Haw. 536, 498 P.2d 635 (1972), *cert. denied,* 409 U.S. 1126 (1973).

Because Estrada's substantial due process rights to a fair trial are implicated, we will notice plain error under HRPP Rule 52(b), notwithstanding Bettencourt's failure to timely object and bring this issue to Judge Mossman's attention. *State v. Marsh,* 68 Haw. ____, 728 P.2d 1301 (1986).

Unquestionably, Estrada's fingerprint exemplar was inadmissible evidence of an unrelated crime under HRE Rule 404(b). *State v. Pokini,* 57 Haw. 17, 548 P.2d 1397 (1976). Exhibit 78 also contained, moreover, fingerprint exemplars of Gamit (for "Alien Possession of a Firearm") and a Romulo Estrada (for "Hindering Prosecution"). The jury knew Gamit was with Estrada during the shooting and could have easily inferred that Romulo Estrada was a relative. Not only was the jury aware of Estrada's criminal record but might have also been prejudiced by the assumption that he associated with other criminals. *State v. Medeiros,* 1 Haw. App. 536, 621 P.2d 986 (1981).

The evidence in this case was close as shown by the large amounts of evidence presented by both sides and the long, three-day deliberation the jury required to reach its verdict. The jury could easily have been prejudiced into convicting Estrada based on his and his associates' fingerprint exemplars. *State v. Huihui,* 62 Haw. 142, 612 P.2d 115 (1980). There was no overwhelming, uncontradicted evidence of guilt, so the submission of Exhibit 78 to the jury cannot be deemed harmless. *See State v. Pulawa,* 62 Haw. 209, 614 P.2d 373 (1980). Judge Mossman, moreover, failed to conduct a *voir dire* to determine the extent of any jury prejudice. *State v. Keliiholokai,* 58 Haw. 356, 569 P.2d 891 (1977).

Because of the improper submission of those inadmissible portions of Exhibit 78 to the jury, we must conclude that the error is not harmless beyond a reasonable doubt. *State v. Domingo,* 69 Haw. ____, 733 P.2d 690 (1987). Plain error thus occurred. *See State v. LaRue,* 68 Haw. ____, 722 P.2d 1039 (1986).

## VII.

### *EXPERT TESTIMONY RULINGS.*

Estrada maintains that Judge Mossman arbitrarily excluded Dr. Murphy's testimony while allowing Dr. Hall to opine that Officer Taguma was very believable (though Judge Mossman had specifically warned State not to let Dr. Hall do this). State answers that 1) Dr. Murphy's testimony (that Officer Taguma had aggressive tendencies not caused by any PTSD) was cumulative of what Dr. Hall later stated; and 2) Judge Mossman promptly struck Dr. Hall's improper statements and later admonished the jury to disregard all stricken evidence.

Judge Mossman excluded Dr. Murphy's testimony when the latter could not conclude that Officer Taguma had a propensity to violence based upon a reasonable medical certainty. On direct examination, Dr. Hall testified:

Q  Dr. Hall, as a result of your testing and interviews, do you have any conclusions as to Keith Taguma and PTSD?

A  As a result of everything, I find him very believable in regards to what came out about the PTSD from himself, the testing, and other sources.

MR. BETTENCOURT: I move to strike the answer as nonresponsive.

THE COURT: I will sustain. I will grant that motion.

Transcript, January 29, 1986 at 140.[8] Dr. Hall later concluded on cross-examination:

Q  (By Mr. Bettencourt) Dr. Hall, is it correct that PTSD may *aggravate any prior characterological conditions or symptoms but does not create them?*

A  It can do both.

Transcript, February 3, 1986 at 28 (emphasis added).

It is presumed that a jury will heed a trial court's instruction. *State v. Perez,* 64 Haw. 232, 638 P.2d 335 (1981). Judge Mossman later ordered the jury to disregard all stricken evidence. Based

---

[8] At this point, Bettencourt should have asked Judge Mossman to instruct the jury to disregard the stricken remark. This would have immediately cured any prejudice flowing from Dr. Hall's improvident statement.

upon Dr. Hall's single improper statement, Judge Mossman's timely striking of the disputed comment, plus the subsequent jury instruction, no prejudice resulted.

Judge Mossman had the discretion to exclude Dr. Murphy's testimony if the latter lacked an expert basis to conclude that Officer Taguma's abusive behavior resulted from character disorders and not PTSD. *State v. Rodrigues,* 67 Haw. 70, 679 P.2d 615, *cert. denied,* 469 U.S. 1078 (1984). It appears completely arbitrary and without reason, however, to exclude Dr. Murphy's opinions while admitting Dr. Hall's findings on the same subject. *See State v. Sacoco,* 45 Haw. 288, 367 P.2d 11 (1961). Judge Mossman seems to have misunderstood the gist of Dr. Murphy's testimony: it did not deal with Officer Taguma's propensity for aggression or violence. Instead, Dr. Murphy's statements would have directly countered State's position explaining Officer Taguma's conduct at Queen's Hospital.

Having admitted Dr. Hall's testimony, it was an abuse of discretion for Judge Mossman to have barred Dr. Murphy from taking the stand. The jury should have heard both experts' testimony on PTSD. *See State v. Summers,* 62 Haw. 325, 614 P.2d 925 (1980).

## VIII.

### SELF-DEFENSE JURY INSTRUCTIONS.

Estrada contends that Judge Mossman did not reread all the self-defense instructions requested by the jury so failed to adequately instruct the jury. State answers that the instructions read to the jury, as well as a complete written set of all the court's instructions, completely stated the applicable law.

Jury instructions, as a whole, must correctly provide the controlling law. *State v. Cordeira,* 68 Haw. ____, 707 P.2d 373 (1985). Estrada, moreover, was entitled to an instruction on every defense or theory of the defense having any support in the evidence. *State v. Russo,* 69 Haw. ____, 734 P.2d 156 (1987). A clearly prejudicial instruction, however, cannot be cured by other proper instructions which do not call attention to the error. *State v. Napeahi,* 57 Haw. 365, 556 P.2d 569 (1976). Estrada complains Judge Mossman should have given defense instruction nos. 2 (use of force) and 3

(use of deadly force) instead of the court's instruction nos. 19 and 25 (formerly State's instruction nos. 8 and 15, respectively).

The relevant instructions read:

### DEFENDANT'S INSTRUCTION NO. 2

The evidence in this case raises the question of whether or not the Defendant, James Estrada, acted in self-defense. The use of deadly force is justified if Defendant James Estrada, believed that such force was immediately necessary to protect himself against serious bodily injury. Actual danger is not necessary to justify self-defense. If the Defendant was confronted by a situation which caused him to believe that he was in immediate danger of serious bodily injury, and if such belief was reasonable under the circumstances, the Defendant's right of self-defense was the same whether such danger was real or merely apparent.

### DEFENDANT'S INSTRUCTION NO. 3

The evidence in this case raises the question of whether or not the Defendant, James Estrada, acted in self-defense. The use of force is justified if Defendant James Estrada, believed that such force was immediately necessary to protect himself against the use of unlawful force by the other person on the present occasion. Actual danger is not necessary to justify self-defense. If the Defendant was confronted by a situation which caused him to believe that the use of force was immediately necessary to protect himself against the use of unlawful force by the other person on the present occasion, and if such belief was reasonable under the circumstances, the Defendant's right of self-defense was the same whether such danger was real or merely apparent.

### INSTRUCTION NO. 19
### (STATE'S INSTRUCTION NO. 8)

A person is justified in using force upon or toward another when the person using the force *reasonably* believes that such

force is immediately necessary for the purpose of protecting himself against the use of unlawful force by the other person on the present occasion.

INSTRUCTION NO. 25
(STATE'S INSTRUCTION NO. 15)

A person is justified in using deadly force upon or toward another when the person using the deadly force reasonably believes that deadly force is immediately necessary to protect himself against death or serious bodily injury.

Record Volume III at 444, 445, 560, 566 (emphasis in original).

While the defense instructions appear more comprehensive, the court's instructions are more concise and far less repetitive. Estrada neglects to note that Judge Mossman also gave the following instructions:

INSTRUCTION NO. 22
(STATE'S INSTRUCTION NO. 14)

The use of deadly force is not justifiable if the defendant knew that he could avoid the necessity of using such force with complete safety by retreating.

INSTRUCTION NO. 23
(DEFENDANT'S INSTRUCTION NO. 4)

The reasonableness of the Defendant's belief shall be determined from the point of view of a reasonable person in the Defendant's position under the circumstances as he believed them to be.

INSTRUCTION NO. 24
(DEFENDANT'S INSTRUCTION NO. 10)

The definition of "Deadly force" means force which the actor uses with the intent of causing or which he knows to create a substantial risk of causing death or serious bodily harm. Intentionally firing a firearm in the direction of another person or in

the direction which another person is believed to be constitutes deadly force. A threat to cause death or serious bodily injury, by the production of a weapon or otherwise, so long as the actor's intent is limited to creating an apprehension that he will use deadly force if necessary, does not constitute deadly force.

*Id.* at 563-65. The court's instructions clearly state that applicable law regarding when deadly force is justified in self-defense under HRS §§ 703-300 (1985) and 703-304 (1985). *State v. Casipe,* 5 Haw. App. 210; 686 P.2d 28 (1984); *State v. Realina,* 1 Haw. App. 167, 616 P.2d 229 (1980).

Estrada additionally complains that, when Judge Mossman re-read the instructions twice, instruction no. 23 was omitted. *See* Transcript, February 4, 1986 at 15-19; Transcript, February 5, 1986 at 2-5. Estrada thus argues the selective transmitting of not all the self-defense instructions was "highly prejudicial" by creating confusion on the question pertaining to the reasonableness of the belief justifying deadly force and constituted reversible error under *State v. Pokini,* 55 Haw. 640, 526 P.2d 94 (1974). There, the trial court had provided the jury with selected instructions and excluded others, and we had condemned such "piecemeal" trans-mission of requested information. *Id.* at 655, 526 P.2d at 105.

Here, by contrast, Judge Mossman provided a complete written set of all the instructions to the jury. No reversible error therefore occurred. *See State v. McNulty,* 60 Haw. 259, 588 P.2d 438 (1978), *cert. denied,* 441 U.S. 961 (1979). But on remand, we think a better practice would be to read *all* the self-defense instructions (unless the jury specifically requests only certain instructions) to avoid another similar controversy.

## IX.

## A.

### ENTERING THE JURY ROOM: EX PARTE COMMUNICATIONS.

Estrada next asserts Judge Mossman improperly communicated with the jury by personally entering the jury room without the presence or consent of Bettencourt. Estrada urges the adoption of a *per se* rule that it is reversible error for a judge to enter the jury

room. *See State v. Hilliard,* 133 Ariz. 364, 651 P.2d 892 (Ct. App. 1982). State replies Bettencourt had known of Judge Mossman's practice of entering the jury room to answer questions, yet failed to object until after the guilty verdict was rendered.[9]

Judge Mossman's "usual practice" is unusual to say the least. Though the proceedings within the jury room were fully transcribed, there was no chance for Bettencourt to object to what Judge Mossman said or whether any special verbal emphasis or facial expressions were given to certain terms which could have improperly influenced the jurors. HRPP Rule 43(a) guarantees defendants and their counsel the right to be present at all stages of trial. Ex parte jury communications are strictly prohibited. *State v. Irebaria,* 55 Haw. 353, 519 P.2d 1246 (1974). Only if the error is harmless beyond a reasonable doubt will the ex parte communication not require reversal. *Pokini,* 55 Haw. at 657, 526 P.2d at 108.

This is not a single instance of ex parte conduct: Judge Mossman personally delivered extended answers to jury questions three separate times during deliberations. *See State v. Miyahira,* 6 Haw. App. ____, 721 P.2d 718 (1986) (single unauthorized communication to the jury after the deliberations and the trial had ended was harmless). Customarily invading the jury room without

---

[9] The following exchange occurred at the sentencing hearing:

[THE COURT:] First of all, I would like the record to reflect, if it doesn't already, that as regards this Court's reading instructions, etc., in the jury room, Mr. Bettencourt, *it has been a precedent and practice in this jurisdiction for many years that the Court does go in with the reporter, and with the court clerk, and with the bailiff.*

MR. BETTENCOURT: *Yeah, I was aware of that.*

THE COURT: Right, and I know you were aware of that because I always advise counsel. And if they have any objections, I ask them to please let me know. There were no objections —

MR. BETTENCOURT: I don't think the record will reflect you advised counsel in this case prior to the first question.

THE COURT: Well, I usually — and I did in this case — advise that immediately after the trial was concluded, and the jury is sent to deliberate.

In any event, this Court did, as it has done in every case, advise both counsel that this was going to be followed, this practice, and if there were any objection, the Court would have considered it, and perhaps had it done in another way. *There was no objection.*

Transcript, April 3, 1986 at 51-52 (emphasis added). At oral argument, Bettencourt explained he had become aware of Judge Mossman's "usual practice" *after* the guilty verdict. That is, Bettencourt claimed to have had no notice of nor had consented to this bizarre procedure.

the parties' or their counsels' presence must not be tolerated: the potential for prejudicial communication is too great. Otherwise, the rule against ex parte jury communication would be meaningless.

"This appeal presents us with an urgent reason to invoke our supervisory jurisdiction over all courts of inferior jurisdiction pursuant to HRS § 602-4 [1985]."[10] *State v. Swafford,* 68 Haw. _____, _____, 729 P.2d 385, 388 (1986) (footnote omitted). We therefore exercise our supervisory powers to declare Judge Mossman's "usual practice" of personally entering the jury room to answer the jurors' questions improper and prejudicial. In either a criminal or civil context, defendants are entitled to a fair and impartial jury trial free from prejudicial ex parte influences. *See Kaowili v. Raymark Industries, Inc.,* 68 Haw. _____, 727 P.2d 67 (1986). On this matter of grave public concern, we admonish all trial judges not to invade the jury room during deliberations. *See Gannett Pacific Corp. v. Richardson,* 59 Haw. 224, 580 P.2d 49 (1978). We decline to adopt the *per se* rule advocated by Estrada, however.

## B.

### *REREADING REQUESTED TESTIMONY.*

Estrada complains that Judge Mossman should have read defense expert Dr. Halford's testimony as well as Officer Taguma's testimony on Officer Taguma's behavior after receiving the first notice about discharge from Queen's Hospital. State answers that Dr. Halford's testimony covered the period of about one month prior to discharge so was not essential compared with Officer Taguma's account.

The jury requested "Dr. Halford's & Keith Taguma's testimony regarding Taguma's condition (tubes and IV's in body, eating solids, etc.) . . . " Record Volume III at 492. After initially rejecting the request by ordering the jurors "to rely upon your collective memories to recall the applicable testimony[,]" *id.,* Judge Mossman

---

[10] HRS § 602-4 reads:

*Superintendence of inferior courts.* The supreme court shall have the general superintendence of all courts of inferior jurisdiction to prevent and correct errors and abuses therein where no other remedy is expressly provided by law.

read back only Officer Taguma's testimony. *See* Transcript, February 5, 1986 at 7-8. No reason was given for ignoring Dr. Halford's testimony which indicated Officer Taguma was violent, verbally abusive, and had preexisting mental problems.

The jury is the sole judge of witness credibility and the weight of the evidence. *State v. Kim*, 64 Haw. 598, 645 P.2d 1330 (1982). Consequently, Judge Mossman should not have arbitrarily denied the jury request for Dr. Halford's testimony. Officer Taguma's and Dr. Halford's testimony disputed why the former was angry. Dr. Halford's account supported the defense theory that Officer Taguma was predisposed to aggressiveness and had a bad temper. Dr. Halford's testimony was thus crucial, and the jury should have had his testimony to determine the truth of Estrada's self-defense assertion.[11] We cannot condone such "piecemeal" presentation of the evidence. *See Pokini*, 55 Haw. at 655, 526 P.2d at 105.

Judge Mossman also may have influenced the jurors into believing that Dr. Halford's testimony was not important compared to Officer Taguma's. That is, they could have thought that, since Judge Mossman did not read back Dr. Halford's account although asked, they should concentrate on only Officer Taguma's testimony. And considering the original jury communication, Dr. Halford's testimony was probably not well-remembered, so emphasizing Officer Taguma's testimony could only bolster State's case to Estrada's detriment. Estrada's right to a fair jury trial free from the improper influence of the trial judge was violated. *See State v. Alfonso*, 65 Haw. 95, 648 P.2d 696 (1982).

## X.

### ENHANCED SENTENCING.

Estrada finally contends that due process was violated when he was sentenced under HRS § 706-606.1(1) (a), although this statute was never raised until after the jury returned its guilty verdict,

---

[11] It is uncertain exactly what the jurors wanted. They could have wanted another part of Dr. Halford's testimony but did not describe what the desired testimony included. If Judge Mossman was unsure, he should have requested the jurors to specify what subject they wanted read again.

because 1) he never received notice; and 2) the jury should have decided whether the statute applied. State replies 1) HRS § 706-606.1(1) (a) is merely a sentencing statute which Judge Mossman could impose; 2) the undisputed facts are that Officer Taguma, in uniform while driving a marked police van on an official errand, was on duty when shot; and 3) Estrada had a fair hearing to argue against the enhanced sentencing.

We have held the better rule is to include in the indictment the aggravating circumstances which, *if proved,* would result in the application of enhanced sentencing of HRS § 706-606 (1985). *State v. Apao,* 59 Haw. 625, 586 P.2d 250 (1978), *subsequent resolution,* 66 Haw. 682, 693 P.2d 405 (1984). The only difference between HRS §§ 706-606 and 706-606.1 is that the former is for murder sentencing whereas the latter is for attempted murder sentencing. *Apao* thus applies to both statutes. *Apao* required a defendant to have "fair notice of the charges against" him: the aggravating circumstances must be *alleged in the indictment and found by the jury.* 59 Haw. at 635-36, 586 P.2d at 258.

Estrada was entitled to due process at his sentencing. *State v. Melear,* 63 Haw. 488, 630 P.2d 619 (1981). Judge Mossman could not make the factual findings that Officer Taguma was on duty when shot. The jury had to but did not determine whether Estrada committed attempted murder and the applicability of HRS § 706-606.1(1) (a). *Compare State v. Huelsman,* 60 Haw. 71, 588 P.2d 394 (1978), *reh'g denied,* 60 Haw. 308 (1979) (different procedures for sentencing under the multiple offender statutes, HRS §§ 706-662 (1985) and 706-664 (1985)).

Because Estrada was not properly sentenced, the erroneous sentence must be vacated and the case remanded, *see State v. Morishige,* 65 Haw. 354, 652 P.2d 1119 (1982), so that he will be afforded all those fundamental rights necessary to a fair trial. *State v. Kamae,* 56 Haw. 628, 548 P.2d 632 (1976); *see State v. Tachibana,* 67 Haw. 573, 698 P.2d 287 (1985).

The sentence is therefore vacated, the guilty conviction is reversed, and the case is remanded for a new trial.

*David Bettencourt,* for Defendant-Appellant

*Artemio C. Baxa (Dave S. Fukuoka, Nancy T. Sugimura,* and *Larry L. Butrick,* with him on the brief), Deputies of the Prosecuting Attorney, for Plaintiff-Appellee