**STATE OF HAWAII**, Plaintiff–Appellee, v. **MALCOLM GREYSON**, Defendant–Appellant

NO. 12664

(FC–CR. NO. 62)

FEBRUARY 9, 1989

LUM, C.J., NAKAMURA, PADGETT,
HAYASHI, AND WAKATSUKI, JJ.

OPINION OF THE COURT BY HAYASHI, J.

Defendant–Appellant Malcolm Greyson (Greyson) appeals his conviction for the murder, under Hawaii Revised Statutes (HRS) § 707–701

(1985),[1] of his infant son Eric Paul Greyson (the Victim). The examining physicians had all testified that the Victim had died of deliberately inflicted abdominal injuries plus had exhibited symptoms of repeated child abuse. Greyson raises as prejudicial, reversible errors Deputy Prosecuting Attorney Emlyn Higa's (Higa) improper 1) opening statement references to alleged past instances of child abuse (suffocating the Victim) without a good faith belief that such evidence would be adduced at trial; and 2) use of a confidential 1984 presentence report for impeachment. We agree that the latter point constituted reversible error, vacate the judgment of conviction, and remand the case for a new trial.

## I.

## BACKGROUND FACTS

The preliminary facts are not controverted. On February 16, 1983 at about 4:00 p.m., Greyson and his wife Maria Greyson (Maria) sought medical care for the seven month–old Victim. The examining physicians discovered the Victim had a swollen abdomen, bruises all over his body, scars, a bruised and lacerated scalp with a bizarre haircut, ruptured intestines, plus a fractured pancreas. Although emergency surgery was performed, the Victim died of his internal injuries on February 17, 1983. A subsequent autopsy indicated that death was caused by blunt abdominal trauma, multiple abdominal trauma, and chronic child abuse. Despite that the suspicious injuries had happened while the Victim was in Greyson's care, Greyson insisted that the Victim had been hurt after falling onto a Rubik's Cube toy. Significantly, though, Maria had serious psychological problems, could not remember important events, and sometimes displayed unusual behavior (she gave the Victim the strange haircut).

On November 23, 1983, Greyson was indicted for murder. A conviction later resulted on November 16, 1984, and he appealed. We re-

---

[1] This statute reads:

   **Murder.** (1) Except as provided in section 707–702, a person commits the offense of murder if he intentionally or knowingly causes the death of another person.

   (2) Murder is a class A felony for which the defendant shall be sentenced to imprisonment as provided in section 706–606.

versed and remanded the case, however, because the trial court had incorrectly prevented the defense from cross-examining Maria about potentially incriminating admissions made to her psychologist. *State v. Greyson*, No. 10367 (Haw. Oct. 1, 1986) (mem.).

Maria, who had returned to her native Bolivia, did not testify at the retrial. By this time, moreover, Greyson had changed his story about the Victim's injuries and instead claimed to have accidentally stepped on the infant who had been placed on the floor to sleep. The trial court later declared a mistrial on May 5, 1987 after the jury could not reach a verdict.

Just prior to the beginning of the third trial on October 26, 1987, a dispute arose 1) whether Maria would return to Hawaii to testify; and 2) whether the prosecution could refer to her earlier statements describing Greyson's abusive behavior if she was unavailable. Although defense counsel Jonathan Ezer (Ezer) on October 27, 1987 reported that Maria's family would not allow her to travel, Higa said that State would bring her from Bolivia. Yet on the morning of October 29, 1987, Ezer 1) asserted that Maria had told him on October 27, 1987 she would not be coming; and 2) requested that Higa's opening statement refrain from referring to Maria's prior claims that Greyson had sometimes quieted the Victim by suffocating the crying child. Higa assured that only the funding for Maria's trip had to be finalized, but later that day discovered that Maria would not appear, and obtained a trial recess to determine if Greyson had influenced her decision.

On November 3, 1987, Higa stated that 1) Greyson had not pressured Maria; 2) Maria's Bolivia lawyer, who had planned to accompany her to Hawaii, had a scheduling conflict; but 3) travel arrangements would be made as soon as the problem was resolved. Maria, though, never arrived.

During opening statements, Higa said:

While Maria was in the Day Hospital, Eric was alone with the defendant in their apartment, and while she was in Day Hospital, Eric suffered a variety of injuries. These included bruises, a cut lip, a large first and second degree burn, a circular burn on Eric's belly, and a skull fracture at the back of Eric's head. The defendant also apparently had a practice at times of suffocating Eric to stop him from crying.

Sometimes when Eric cried and could not be quieted in the usual manner—checking the diapers or feeding him or walking

> him around—defendant took him into the bathroom and closed the door. And he would remain in there perhaps for about five minutes, and when he came out, Eric wouldn't be crying any more. He would look dazed, but he would be very quiet and very still, and there would be red marks on his cheeks and chin. What the defendant was doing, of course, was putting his hands over the nose and mouth of Eric while they were in the bathroom.

Transcript of November 3, 1987 at 17–18. Overruling Ezer's objections, the trial court nevertheless instructed Higa to 1) stop being conclusory; and 2) instead tell the jury that evidence or testimony would be presented about the child abuse.

During the later questioning of former medical examiner Dr. Charles Odom (who had performed the autopsy on the Victim), Higa attempted to elicit an expert opinion about the supposed suffocation, but the trial court ruled that the reliance on Maria's account was improper under Hawaii Rules of Evidence (HRE) Rule 703.[2]

At the close of prosecution's case on November 9, 1987, Ezer sought a mistrial because of the prejudicial references to Greyson's acts of suffocation since Maria had not testified about her statements. The trial court denied the request noting that Ezer had made no timely demand for a mistrial or a curative jury instruction.[3]

After Greyson had taken the stand, Ezer protested Higa's efforts to bring up the suffocation incidents by the prejudicial use of Greyson's con-

---

[2]This rule provides:

> **Bases of opinion testimony by experts.** The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court may, however, disallow testimony in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

[3]We admonish all counsel to promptly assert motions for a mistrial or for curative jury instructions. *State v. Senteno*, 69 Haw. ___, 742 P.2d 369 (1987). We strongly disapprove of gambling on the outcome of the trial or on further developments in the case before complaining about the allegedly prejudicial errors. *State v. LaRue*, 68 Haw. 575, 722 P.2d 1039 (1986).

fidential presentence report. The trial court, however, allowed Higa to proceed:

> Q    (By Mr. Higa) Mr. Greyson, I'm handing you a document [the presentence report] and if you read the area that I have indicated to yourself and let me know when you're done?
>
> A    Yes, I remember writing this about four years ago now. Thank you for bringing it to my attention.
>
> Q    On October 10, 1984, you had written that you would bring Eric into the bathroom to quiet him?
>
> A    Yes, I would walk around the apartment and as I — as I recollect now, I would walk into the bathroom area and since there was no light — windows in that area of the apartment, he would calm down quicker in the subdued — subdued at — lighting of the bathroom.
>
> . . . .
>
> Q    Excuse me, to quiet Eric, to pacify him when he's crying and in a cranky mood. In order to pacify him in that short period of time, just a few minutes, are you saying that all you did was rock him?
>
> A    Yes, rock him gently and pat him on the back.
>
> . . . .
>
> Q    (By Mr. Higa) Mr. Greyson, wasn't it the case that in order to get Eric quiet when he was in that condition and in such a brief period of time and in the bathroom, that *the method that you used was putting your hands over his mouth and nose suffocating him until he was unconscious or semi–conscious* and that that's why there were red marks on his cheek and chin, when he came out of the bathroom, after one of these sessions?
>
> . . . .
>
> THE DEFENDANT: No.

Transcript of November 9, 1987, November 10, 1987, and November 12, 1987, vol. II at 268–69, 272 (emphasis added).

On November 17, 1987, the jury returned a guilty verdict. The conviction was entered, and this appeal followed.

But later at the hearing on the motion for release on bail pending appeal, Higa revealed that State could not transport Maria to Hawaii because her attorney had refused to accompany her unless a $10,000 fee was paid.

Ezer argued that this surprise disclosure demonstrated State never had a good faith belief about producing Maria for trial.[4]

## II.

## QUESTION PRESENTED[5]

The following issue is dispositive of this case:

Whether the trial court abused its discretion by permitting the use of the presentence report? YES.

We thus decline to address the other issues posed on appeal.

## III.

## USE OF THE 1984 PRESENTENCE REPORT

Greyson advances that the use of his 1984 presentence report 1) improperly impeached his credibility; and 2) violated HRS § 806–73

---

[4]The opening statement merely provides the opportunity to advise and outline for the jury the facts and questions to be posed during the trial but is not evidence. *State v. Simpson*, 64 Haw. 363, 641 P.2d 320 (1982). Yet, a prosecutor is obliged not to advance arguments designed to prejudice the accused. *See State v. Marsh*, 68 Haw. 659, 728 P.2d 1301 (1986).

Here, the circumstances surrounding Maria's availability to testify are suspicious. Trial had begun, and Higa was still unable to obtain her presence because of her family's opposition, her own reluctance to travel, plus the difficulties with her Bolivia attorney. Higa's late explanation about the $10,000 demanded fee, moreover, raises the strong inference that State lacked a genuine good–faith belief that Maria would take the stand. *See State v. White*, 65 Haw. 286, 651 P.2d 470 (1982) (per curiam). Higa's overzealousness to convict Greyson by the questionable use of the suffocation incidents, although Maria was likely not going to testify, was not *de minimis*. *See State v. Johnson*, 3 Haw. App. 472, 653 P.2d 428 (1982). We condemn such overreaching but do not determine if this conduct amounted to reversible error.

[5]The defense's statement of the case section violates Hawaii Rules of Appellate Procedure (HRAP) Rule 28(b)(3) by not fully reciting the incriminating ex-

(1985).[6] State responds that Higa 1) correctly utilized the report only to refresh Greyson's recollection; and 2) neither the nature of the document nor any private information was divulged to the jury.

Although the trial court normally possesses the wide discretion to admit evidence and to allow questioning, *State v. Estrada*, 69 Haw. ___, 738 P.2d 812 (1987), the trial court cannot disregard a statutory prohibition against the use of certain information. *State v. Domingo*, 69 Haw. ___, 733 P.2d 690 (1987); *see State v. Castro*, 69 Haw. ___, 756 P.2d 1033 (1988).

HRS § 806–73 reads in relevant part (emphasis added):

**Duties and powers of probation officers; adult probation records.**

. . . .

*All records of the State of Hawaii adult probation divisions are confidential and are not public records, including but not limited to, all records made by any adult probation officer in the course of performing official duties*; provided that such records, or the content of such records, shall be divulged only as follows:

    (1)    A copy of any adult probation division case record or of a portion of it, or the case record itself, shall upon request be provided to an adult probation officer of the State of Hawaii adult probation division which originated the record; provided that a written summary of the record may be provided upon request to an adult probation officer of another State of Hawaii adult probation division or to an adult probation officer of a probation department of another state which

---

pert medical testimony by the examining physicians. *See* Opening Brief at 9–13. There is no excuse for these omissions. *See State v. Hanawahine*, 69 Haw. ___, 755 P.2d 466 (1988). The standard of review section is also in noncompliance with HRAP Rule 28(b)(5). *See* Opening Brief at 21.

[6]The 1972 version of the statute, in effect at the time the 1984 presentence report was prepared, had no confidentiality provision. The 1985 legislature imposed the privacy requirements. Act 167, § 1, 1985 Haw. Sess. Laws 279, 280; *see also* Act 90, § 1, 1984 Haw. Sess. Laws 166, 166.

is providing supervision of a probationer convicted and sentenced by the courts of Hawaii.

(2) A copy of a presentence report shall be provided to the persons or entities named in section 706–604; to the Hawaii paroling authority; to any psychiatrist, psychologist, or other mental health practitioner who is treating the defendant pursuant to a court order for mental health care; in accordance with applicable law, to persons or entities doing research; to any adult probation officer providing supervision of an offender in Hawaii; or to any adult probation officer providing supervision of an offender in another state if the offender was convicted and sentenced in the courts of Hawaii. *Any persons or entities not entitled pursuant to this section or pursuant to section 706–604 to receive a copy of a presentence report are not entitled to receive a summary of a report and are not entitled to view a report.*

HRS § 706–604 (1985 and Supp. 1987) thus permits only the above–mentioned parties as well as the courts, the defendant, the defense counsel, and the custodial institution (the Department of Social Services and Housing, the Department of Corrections, or the confining private facility) use of the confidential presentence report.

Clearly, Higa should not have employed the report for purposes not contemplated by HRS § 806–73. *See, e.g., State v. Fields*, 67 Haw. 268, 686 P.2d 1379 (1984). Greyson's credibility was adversely affected when he was shown to have either forgotten taking the Victim into the bathroom or to have been deceitfully concealing the facts concerning the heinous acts of child abuse. *See, e.g., In re John Doe*, 70 Haw. ___, 761 P.2d 299 (1988).

The unlawful use of the presentence report seriously undermined Greyson's entire defense. Given the conflicting versions of the Victim's death, that Greyson was the only eyewitness, the inflammatory charges, and that the case was close (as evidenced by the previous hung jury in the second trial), we cannot say that the violation of HRS § 806–73 was harmless beyond a reasonable doubt. *See State v. Wideman*, 69 Haw. ___, 739 P.2d 931 (1987).

We acknowledge that certain evidentiary rules allow the limited use of an accused's prior statements in particular situations. *See* HRE Rules 612 and 613.[7] HRS § 806–73, though, is the more narrow authority. Where a plainly irreconcilable conflict exists between a law of general application and law of specific application concerning the same subject matter, the specific authority will be favored. *State v. Spencer*, 68 Haw. 622, 725 P.2d 799 (1986).

---

[7]The relevant provisions read in pertinent part:

> **Rule 612 Writing used to refresh memory.** If a witness uses a writing to refresh the witness' memory for the purpose of testifying, either:
> (1) While testifying, or
> (2) Before testifying, if the court in its discretion determines it is necessary in the interests of justice,

an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross–examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness. If it is claimed that the writing contains matters not related to the subject matter of the testimony the court shall examine the writing in camera, excise any portions not so related, and order delivery of the remainder to the party entitled thereto. Any portion withheld over objections shall be preserved and made available to the appellate court in the event of an appeal. If a writing is not produced or delivered pursuant to order under this rule, the court shall make any order justice requires, except that in criminal cases when the prosecution elects not to comply, the order shall be one striking the testimony or, if the court in its discretion determines that the interests of justice so require, declaring a mistrial.

> **Rule 613 Prior statements of witnesses.** (a) Examining witness concerning prior statement. In examining a witness concerning a prior statement made by the witness, whether written or not, the statement need not be shown nor its contents disclosed to the witness at that time, but on request the same shall be shown or disclosed to opposing counsel.

> (b) Extrinsic evidence of prior inconsistent statement of witness. Extrinsic evidence of a prior inconsistent statement by a witness is not admissible unless, on direct or cross–examination, (1) the circumstances of the statement have been brought to the attention of the witness, and (2) the witness has been asked whether the witness made the statement.

These provisions are codified in HRS ch. 626 (1985).

## IV.

## CONCLUSION

For these reasons, we vacate the judgment of conviction and remand the case for a new trial. *See State v. Fox*, 70 Haw. ___, 760 P.2d 670 (1988).

*Jonathan Ezer* (*Alvin T. Sasaki* on the briefs; Ezer & Sasaki, of counsel) for Defendant–Appellant.

*Ellen B. Politano*, Deputy Prosecuting Attorney, for Plaintiff–Appellee.