923 P.2d 934

**STATE of Hawai'i, Plaintiff–Appellee,**

**v.**

**Samuel B. SANCHEZ, Defendant–Appellant.**

**No. 17724.**

Intermediate Court of Appeals of Hawai'i.

Aug. 5, 1996.

As Amended Aug. 6, 1996.

Certiorari Denied Aug. 26, 1996.

---

Theodore Y. H. Chinn (Debra K. Loy with him, on the brief), Deputy Public Defenders, Honolulu, for defendant-appellant.

Mark R. Simonds, Deputy Prosecuting Attorney, County of Maui, Wailuku, for plaintiff-appellee.

Before BURNS, C.J., and WATANABE and ACOBA, JJ.

ACOBA, Judge.

On December 16, 1993, Defendant–Appellant Samuel B. Sanchez (Defendant) was convicted of (1) being a felon in possession of a firearm in violation of Hawai'i Revised Statutes (HRS) § 134–7(b) (1993); (2) being a felon in possession of firearm ammunition in violation of HRS § 134–7(b); and (3) terroristic threatening in the first degree in violation of HRS § 707–716(1)(d) (1993). Pursuant to HRS § 706–662(4) (1993), Defendant was sentenced to extended terms of twenty years each on the first and second convictions, and ten years on the third conviction, with all terms to run concurrently. Because the instant offenses were felonies committed within five years after a prior class C felony conviction, Defendant was also sentenced to a mandatory minimum term of imprisonment of three years and four months without the possibility of parole pursuant to HRS § 706–606.5(1)(a)(iii) (1993) as a "repeat offender."

On appeal, Defendant raises the following points of error: (1) the trial court erred in admitting testimony that Defendant was in custody at the time of the offense; (2) Defendant was denied a fair trial because of the prosecutor's misconduct; and (3) the trial court abused its discretion in sentencing Defendant to extended terms of imprisonment. Defendant does not challenge the sufficiency

of the evidence for his convictions or his "repeat offender" sentence.

We (1) reverse the two convictions under HRS § 134–7(b) premised on Defendant's prior felony status, (2) vacate the extended term sentences, (3) vacate the conviction for terroristic threatening in the first degree under HRS § 707–716(1)(d), (4) vacate the repeat offender sentence under HRS § 706–606.5(1)(a)(iii) for the terroristic threatening conviction, and (5) remand the case for a new trial on the terroristic threatening charge.

## I.

On May 10, 1993, Defendant was in Kīhei, Maui on a work furlough from the Maui Community Correctional Center (MCCC), where he was serving a probationary sentence for a felony conviction.[1] On that date, Defendant was accused of threatening his daughter Venus Sanchez's (Venus) boyfriend, Ray Ubias (Ray), with a crowbar and a knife, and of being a felon in possession of a shotgun and shotgun ammunition.

The State's first witness, Defendant's probation officer, Evelyn Mukogawa (Ms. Mukogawa), testified that she was monitoring Defendant for "a felony" conviction. Ms. Mukogawa explained an "information sheet on possession of firearms" to Defendant and notified him that "because you're a convicted felon you cannot have for the rest of your life any type of firearms or ammunition."

Michael Berghash (Mr. Berghash), the acting correctional supervisor at MCCC, confirmed that Defendant was an inmate at MCCC, and that on May 10, 1993 Defendant was given a four-hour "job search pass" to seek employment. The defense objected to this "line of questioning." The court overruled the objection, finding that the limited purpose of the pass was relevant to establish Defendant returned to his home with the intent "to cause some problems."

Ray testified that he was Venus's boyfriend and that he had been at Defendant's home on May 10, 1993. Ray further indicated that after Defendant arrived, Ray and Defendant had an argument, but Ray denied

seeing Defendant holding anything in his hands. Ray left the house on foot because Defendant prohibited Ray from removing his car from the premises. After leaving the house, Ray summoned a police officer. Ray reported that he told the officer that he and Defendant had been arguing, but denied informing the officer that Defendant had threatened to kill him or had possessed any weapon. Ray testified that he "[g]ave" the shotgun shell that he found "on top by the T.V." to the police.

This version of the events apparently contradicted Ray's prior statements to the police, and the prosecutor was permitted to ask Ray leading questions. During the examination, the prosecutor asked Ray about prior statements Ray had made to the prosecutor which contradicted Ray's trial testimony. The court overruled defense counsel's objection to the initial question.

Venus related that she and Ray had discussed the need "to tell the truth" at trial, and admitted that she had lied to the police and to the grand jury in her previous accounts of the incident.

Venus acknowledged that Defendant had entered the house after she, Ray, and her sister May Sanchez (May) had arrived, but denied that Defendant had a knife or crowbar when he entered. She confirmed that Defendant did not like Ray and that an argument had ensued between Ray and Defendant. Venus denied that Defendant threatened to kill Ray.

Venus testified that she and May decided to fabricate a story which would result in Defendant's arrest "[b]ecause all of [them were] mad" at Defendant and wanted him "to be in jail." Venus and May were "scared" because Defendant had told their landlord to call the police because of "the damage in the house." The story they concocted was of Defendant having a crowbar, a knife, and a gun. As he had done with Ray, the prosecutor repeatedly asked Venus about statements Venus had made during a meeting with the prosecutor before trial.

---

1. Defendant was sentenced to five years' probation with six months of confinement for his prior conviction of criminal property damage in the second degree, a class C felony.

May corroborated her sister's testimony, reiterating that she, Venus and Ray had "made a story up." She stated that Defendant and Ray had an argument, but denied that any knife, crowbar, or firearm was involved. She also denied that Defendant threatened to kill Ray.

After Venus, May, and Ray concluded their testimonies, the prosecutor moved to admit the transcript of their grand jury testimonies as "extrinsic, substantive evidence" of the actual events which occurred on May 10, 1993. Following argument outside of the jury's presence, the court allowed the transcripts into evidence.[2]

At the grand jury hearing of June 18, 1993, Ray testified that after he and Defendant had argued, Defendant came into the house with a "knife and crowbar" and threatened to "kill" him. Ray also reported that he had seen a gun in Defendant's house before the date in question. He "found the bullet" for the gun on May 10, 1993. After the confrontation with Defendant, he and Venus located the gun "[u]nderneath [Defendant's] bed." Ray described the gun as "brown" with "a pump" and a black barrel. When asked where the bullet came from, Ray replied that it was from the "shotgun[.]" Venus and May also testified at the grand jury hearing and supported Ray's account of the events. May called the gun a "shotgun," and described it as "kind of old, [and] rusty" with a "brown handle." May confirmed that the shotgun was fitted with a "pump."

At trial, Defendant's wife, Januaria Sanchez (Januaria), admitted that Billy Belue (Billy), May's former boyfriend, came to the house after the incident. Januaria denied

asking Billy to take Defendant's shotgun from the house. However, Billy testified Januaria called him and requested that he remove the shotgun from the house. Billy disposed of the shotgun in a "dumpster."

Officer Mark Freitas (Officer Freitas) reported that on May 10, 1993, Ray and Venus had "flagged" him down to the side of a roadway. Ray said he "was threatened with a knife by another male." Ray explained that he and Venus had fled because Defendant "kept [a] gun within the residence ... and [Defendant] was getting the gun at the time they fled."

Officer Freitas observed Defendant attempting to leave the residence as the officer arrived. After Officer Freitas advised Defendant of his rights, Defendant stated that he had argued with Ray over "some damage in the residence[.]" Defendant admitted owning a shotgun but denied using it in the altercation.

Detective John Morioka (Detective Morioka) located a crowbar which Ray, Venus, and May identified as the one involved in the incident. Neither Ray, Venus, nor May, however, were able to identify any knife as the one allegedly used by Defendant.

Defendant testified, through an interpreter, that he went home while on his job search pass. He saw Ray, Venus and May at the house and became angry because "Ray went ... get [sic] [Venus] pregnant" and was "giving drugs to Venus." Defendant observed some damage in the house and was leaving to contact the landlord when the police arrived and arrested him.[3]

---

2. The transcripts were admissible under Hawai'i Rules of Evidence (HRE) Rule 802.1(1)(A), which provides as follows:

**Rule 802.1 Hearsay exception; prior statements by witnesses.** The following statements previously made by witnesses who testify at the trial or hearing are not excluded by the hearsay rule:

(1) Inconsistent statement. The declarant is subject to cross-examination concerning the subject matter of the declarant's statement, the statement is inconsistent with the declarant's testimony, the statement is offered in compliance with rule 613(b), and the statement was:

(A) Given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition[.]
See State v. Canady, 80 Hawai'i 469, 911 P.2d 104 (App.1996).

3. Defendant's interpreter reported as follows:
THE INTERPRETER: [Defendant] said when he ... called the landlord to call the cops to say what happened inside the house and then later on he saw the shell inside the house.
Q. [(DEFENSE COUNSEL)] And then what happened?
THE INTERPRETER: After he saw everything he went to see the landlord to tell the truth about the shell because he's only in [sic]

## II.

Initially, we note that Defendant does not contest the State's failure to submit the judgment of Defendant's prior felony conviction into evidence as proof that Defendant was a felon at the time he allegedly possessed a firearm and ammunition. In the absence of evidence showing its unavailability, however, the State was required to submit the judgment of conviction itself, or a properly authenticated copy thereof, into evidence to establish the material element of Defendant's prior felony conviction. *State v. Buffalo,* 4 Haw.App. 646, 674 P.2d 1014 (1983), *cert. denied,* 67 Haw. 686, 744 P.2d 781 (1984); *accord State v. Eline,* 70 Haw. 597, 604, 778 P.2d 716, 720 (1989).

## A.

In *Buffalo,* this court held that "the best evidence to prove a conviction is the judgment of conviction itself or a properly authenticated copy thereof."[4] *Id.* at 649, 674 P.2d at 1017 (citations omitted). Thus, in the instant case, the State was required to offer Defendant's prior judgment of conviction, or a properly authenticated copy of it, into evidence to establish the element of Defendant's prior conviction of a felony.[5] *Id.*

Without a showing that the judgment or a copy was unavailable, Ms. Mukogawa's testimony was not competent to prove Defendant's status as a felon. Under facts similar to the instant case, this court ruled in

> probation and he's not allowed to have any armor to hold [sic] any possession of armor, the impala.
> Q. Impala, what is that?
> A. The shell, the bullet.

4. The *Buffalo* court partly relied on HRE Rules 1002, 1003, and 1005 in requiring production of the judgment of conviction or a properly authenticated copy as "the best evidence[.]" *State v. Buffalo,* 4 Haw.App. 646, 649, 674 P.2d 1014, 1017 (1983). HRE Rule 1002 requires the production of the original writing "[t]o prove the content of a writing[.]" HRE Rule 1003 provides for the admissibility of duplicates "to the same extent as an original unless (1) a genuine question is raised as to the authenticity of the original, or (2) in the circumstances it would be unfair to admit the duplicate in lieu of the original." HRE Rule 1005 states that "[t]he contents of a public record, if otherwise admissible, may

*Buffalo* that a parole officer's testimony that the appellant had been convicted of a prior felony "fail[ed] to satisfy the best evidence rule regarding the proof of a prior conviction." *Id.* at 651 n. 6, 674 P.2d at 1018 n. 6.

> Where the party seeking to prove a prior conviction has failed to show the unavailability of the judgment or a certified copy thereof, other evidence of conviction would not be competent to prove such prior conviction beyond a reasonable doubt. *See* 3 C. Torcia, *Wharton's Criminal Evidence* §§ 538, 653 (13th ed. 1973). Where, however, the party seeking to prove the prior conviction shows that the judgment or certified copies of the judgment have been destroyed, lost, or are otherwise unobtainable by the exercise of reasonable diligence, secondary evidence of the content of the judgment would be admissible. *See* HRE [ ] Rule 1005; 29 *Am.Jur.2d Evidence* § 480 (1967).

*Id.* at 649, 674 P.2d at 1017. Here, because the State "failed to show the unavailability of the judgment or a certified copy" of it, the probation officer's testimony as to Defendant's prior conviction was not competent evidence to prove Defendant's prior felony conviction beyond a reasonable doubt. *See id.*

We recognize plain error under Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b).[6] "[W]here plain error has been committed and substantial rights have been affected thereby, the error may be noticed

> be proved by copy, certified as correct in accordance with Rule 902. . . ."

5. In *Buffalo,* the prosecutor offered the following as evidence of the defendant's prior conviction: (1) a cover sheet purporting to be an attestation and certification of the attached documents; (2) a copy of an information charging the defendant with a felony; (3) a copy of the clerk's minutes of the arraignment hearing; (4) a copy of the clerk's minutes of the sentencing hearing; and (5) an abstract of judgment. *Id.* at 647–48, 674 P.2d at 1016.

6. Hawai'i Rules of Penal Procedure (HRPP) Rule 52(b) provides as follows:

> **(b) Plain Error.** Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court.

even though it was not brought to the attention of the trial court." *State v. Kelekolio,* 74 Haw. 479, 515, 849 P.2d 58, 75 (1993). It was plain error to allow the probation officer's testimony to establish Defendant's prior felony conviction where the State had not shown the unavailability of Defendant's prior conviction judgment.

Defendant's "substantial rights" were affected because Defendant's convictions under HRS § 134–7(b) and sentence to extended terms pursuant to HRS § 706–662[7] were the result of the erroneous admission of evidence relating to his status as a felon. HRPP Rule 52; *Kelekolio, supra.*

## B.

### 1.

■ In *Buffalo, supra,* this court reversed and remanded the case for a new trial. But since *Buffalo* was decided, our supreme court has held that the double jeopardy clause in article I, section 10 of the Hawai'i Constitution "precludes retrial of a defendant whose conviction has been set aside because of insufficient evidence, [and] sufficiency of the evidence is reviewed *based only on the evidence that was properly admitted at trial.*" *State v. Wallace,* 80 Hawai'i 382, 414 n. 30, 910 P.2d 695, 727 n. 30 (1996) (emphasis in original).

As we have indicated, the probation officer's testimony, which would prove Defendant was a felon, was improperly admitted at trial for that purpose, and therefore, could not be considered as proof of that essential element. Because no other evidence could be competent to prove this element in the absence of a proper foundation establishing the unavailability of a prior judgment or its copy, *a fortiori,* there was no other evidence on that issue properly admitted at trial. As in *Wallace,* where an "inadequate foundation was laid to show that the weight [of the cocaine,] measured by the balance" was accurate, *id.* at 412, 910 P.2d at 725, an "inadequate foundation" was laid in this case to

admit the probation officer's testimony that Defendant was a felon.

Since Defendant's status as a felon was a "material element" of the offense and was "not supported by substantial *and admissible evidence,* ... the prosecution failed to adduce sufficient evidence to prove every element of the offense[s] beyond a reasonable doubt...." *Id.* at 413, 910 P.2d at 726 (emphasis in original) (citation omitted). "[B]ecause the evidence adduced at trial—*disregarding* the testimony lacking adequate foundation—was insufficient to prove [the] material element [that Defendant was a felon] beyond a reasonable doubt," a new trial of the charged offenses of being a felon in possession of a firearm and in possession of firearm ammunition therefor is prohibited, "inasmuch as 'the prohibition against double jeopardy where reversal is based on insufficiency of evidence is absolute.'" *Id.* at 414 n. 30, 910 P.2d at 727 n. 30 (emphasis in original) (quoting *State v. Bannister,* 60 Haw. 658, 660–61, 594 P.2d 133, 134–35 (1979)).

### 2.

■ The supreme court also held in *Wallace* that "remanding the case for retrial on lesser included offenses" would not offend the double jeopardy clause. *Id.* at 414, 910 P.2d at 727 (emphasis omitted). Accordingly, although a material element of the offense at issue in *Wallace* (promoting a drug in the first degree) was "not supported by substantial and admissible evidence in the record," *id.* at 415 n. 35, 910 P.2d at 729 n. 35, the court concluded that the evidence was sufficient to support a conviction on the lesser included offense of promoting a dangerous drug in the third degree. *Id.* at 415–16, 910 P.2d at 728–29. The *Wallace* court remanded the matter to the circuit court, with the instruction that "a judgment should be entered convicting Wallace of promoting a dangerous drug in the third degree...." *Id.* at 416, 910 P.2d at 728–29.

---

7. In its December 28, 1993 order granting the State's motion for extended terms, the court based its order on, among other findings, that Defendant "was found guilty as charged" of two

counts under Hawai'i Revised Statutes (HRS) § 134–7(b) and was "now being sentenced for more than two felonies[.]"

In this case, however, we are precluded from remanding the case for retrial because there are no lesser included offenses of HRS § 134–7(b) under HRS chapter 134. HRS § 701–109(4) (1993) describes lesser included offenses as follows:

(4) A defendant may be convicted of an offense included in an offense charged in the indictment or the information. An offense is so included when:

(a) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or

(b) It consists of an attempt to commit the offense charged or to commit an offense otherwise included therein; or

(c) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a different state of mind indicating lesser degree of culpability suffices to establish its commission.

At the time of Defendant's indictment, none of the sections in HRS chapter 134 set forth lesser included offenses of the offense of being a felon in possession of a firearm or ammunition therefor.[8]

HRS § 134–7(b) specifically sets forth the offense of a felon in possession of a firearm or ammunition therefor:

(b) *No person who* is under indictment for, or has waived indictment for, or has been bound over to the circuit court for, or *has been convicted* in this State or elsewhere *of having committed a felony,* or any crime of violence, or an illegal sale of any drug *shall own, possess, or control any firearm or ammunition therefor.*

(Emphases added.) The possession of ammunition, other than as set forth in HRS § 134–7(b), is not prohibited under HRS chapter 134.

HRS chapter 134 does contain provisions relating to the possession of firearms in HRS §§ 134–6(a) (1993)[9] and 134–51(b) (1993).[10] Although both HRS §§ 134–6(a) and 134–51(b) prohibit a person from "knowingly" carrying or possessing a firearm or a deadly weapon, these statutes also require that the defendant be "engaged in the commission of a separate felony," HRS § 134–6(a), or be "engaged in the commission of a crime," HRS § 134–51(b). HRS § 134–7(b) does not require these elements, however. HRS §§ 134–6(a) and 134–51(b) require different or more facts than HRS § 134–7(b) to establish the offense charged, and therefore, HRS §§ 134–6(a) and 134–51(b) are not included offenses as defined in HRS § 701–109(4)(a).

HRS § 701–109(4)(b) is also not applicable. Neither HRS §§ 134–6(a) nor 134–51(b) constitutes "an attempt to commit the offense

---

8. HRS § 134–8(a) (1993) provides as follows:

§ 134–8 **Ownership, etc., of automatic firearms, silencers, etc., prohibited; penalties.** [*Effective on July, 1994.*] (a) The manufacture, *possession,* sale, barter, trade, gift, transfer, or acquisition of any of the following is prohibited: assault pistols, except as provided by section 134–4(e); automatic firearms; rifles with barrel lengths less than sixteen inches; *shotguns* with barrel lengths less than eighteen inches; . . . .

(Emphases added.)

Assuming *arguendo* that the shotgun's barrel in this case was less than eighteen inches, this statute would be inapplicable because Defendant was charged and convicted in 1993, prior to the effective date of this statute.

9. HRS § 134–6(a) (1993) states in relevant part: It shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony, whether the

firearm was loaded or not, and whether operable or not; provided that a person shall not be prosecuted under this subsection where the separate felony is:

(1) A felony offense otherwise defined by this chapter;

. . .

(3) The felony offense of terroristic threatening in the first degree under section [707–716(1)(a)], [707–716(1)(b)], and [707–716(1)(d)][.]

10. HRS § 134–51 (1993) provides:

§ 134–51 **Deadly weapons; prohibitions; penalty** . . . .

(b) Whoever knowingly possesses or intentionally uses or threatens to use a deadly or dangerous weapon while engaged in the commission of a crime shall be guilty of a class C felony.

*See State v. Jones,* 61 Haw. 135, 597 P.2d 210 (1979) (holding that a shotgun constitutes a deadly or dangerous weapon).

charged" or "an offense otherwise included" in HRS § 134–7(b). HRS § 701–109(4)(b).

■ HRS § 701–109(4)(c) further describes a lesser included offense as one which "differs from the offense charged only in the respect that a less serious injury or risk of injury to the *same* person, property, or public interest or a different state of mind indicating *lesser* degree of culpability suffices to establish its commission." (Emphases added.) Because HRS § 134–6(a) requires the commission of a separate felony and HRS § 134–51(b) requires the commission of a crime, each manifestly involves a risk of injury to a public interest different from that public interest which prohibits possession of a firearm based solely on a person's status as a felon. Finally, neither the "knowing" state of mind required by HRS § 134–6(a) nor the "knowing" or "intentional" state of mind required under HRS § 134–51(b) amount to a "lesser degree of culpability" than the intentional, knowing or reckless state of mind that would ostensibly apply to an HRS § 134–7(b) offense.[11]

Because there is no lesser included offense of a felon in possession of a firearm or ammunition in HRS chapter 134, we are precluded from remanding these convictions for retrial. Accordingly, we reverse Defendant's convictions on the counts of being a felon in possession of a firearm and a felon in possession of firearm ammunition under HRS § 134–7(b). *See Wallace, supra.*

## III.

■ The prosecutor mentioned Defendant's custody status in his opening statement and asked Mr. Berghash "whether or not [Defendant] was an inmate in the [Maui] correctional facility" on May 10, 1993, the date of the incident. When the prosecutor questioned Mr. Berghash about the four-hour

pass that Defendant was given to locate a job, defense counsel objected to the "whole line of questioning" as "irrelevant," and in the alternative, as "more prejudicial than probative[.]" The court overruled the objection.

Defendant argues that Mr. Berghash "had no other purpose at trial [other] tha[n] to present testimony about [D]efendant's custody status." The State maintains that Defendant's violation of his four-hour job search pass "was probative evidence of his intent to threaten Ray Ubias by going out of his way to go to his house where he was not allowed to be." According to the State, this evidence also showed that Defendant "risked revocation of such passes in the future, an inference which further establishes the intent element with respect to the Terroristic Threatening charge."

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." HRE Rule 401; *see Kealoha v. County of Hawaii,* 74 Haw. 308, 314–15, 844 P.2d 670, 674, *reconsideration denied,* 74 Haw. 650, 847 P.2d 263 (1993). Evidence that Defendant violated his four-hour pass was not a fact of consequence to any material issue. In relevant part, HRS §§ 707–716(1)(d) and 707–715 (1993) require the State to prove that Defendant intended, with the use of a dangerous instrument, to threaten, by word or conduct, to cause bodily injury to another person. The fact that Defendant returned to his home was never disputed and was not probative of Defendant's intent. There was no evidence that Defendant knew before he returned home on May 10, 1993 that Ray would be at Defendant's home. Indeed, the evidence appears to be otherwise.[12] Defendant's violation of his fur-

---

11. HRS § 134–7(b) does not list any state of mind requirement for the offense involved. HRS § 702–204 (1993) states that when "the state of mind required to establish an element of an offense is not specified by the law, that element is established if, with respect thereto, a person acts intentionally, knowingly, or recklessly." Thus, the state of mind element of the offense in HRS § 134–7(b) is established "when a previously convicted felon possesses or controls a firearm

'intentionally, knowingly, or recklessly.'" *State v. Pinero,* 70 Haw. 509, 526, 778 P.2d 704, 715 (1989).

12. Defendant's interpreter explained as follows:

Q. [(DEFENSE COUNSEL)] How did you feel when you found out Ray was there [at home]?

lough was not connected at trial to a plan to return home for the purpose of confronting Ray, and thus, was never linked to the terroristic threatening charge. On the other hand, Mr. Berghash's testimony introduced the extraneous issue of Defendant's furlough violation.

## IV.

Defendant contends that he was denied a fair trial because of prosecutorial misconduct. Specifically, Defendant complains of the prosecutor's (1) remark in his opening statement that Defendant would "do anything to stay out of trouble with the law except follow it[;]" (2) personal assertions in his questioning of witnesses; (3) attempt to "intimidate the witness[ ] by his physical conduct in standing so close to the witness[;]" (4) compound and argumentative questioning of witnesses; and (5) alleged improper remarks in closing argument.

"Prosecutorial misconduct warrants a new trial or the setting aside of a guilty verdict only where the actions of the prosecutor have caused prejudice to the defendant's right to a fair trial." *State v. McGriff,* 76 Hawai‘i 148, 158, 871 P.2d 782, 792 (1994) (citations omitted). "[T]o determine whether reversal is required under HRPP Rule 52(a) because of improper remarks by a prosecutor which could affect Defendant's right to a fair trial, we apply the harmless beyond a reasonable doubt standard of review." *State v. Suka,* 79 Hawai‘i 293, 301, 901 P.2d 1272, 1280 (App.), *cert. denied,* 79 Hawai‘i 341, 902 P.2d 976 (1995); *State v. Holbron,* 80 Hawai‘i 27, 904 P.2d 912, *reconsideration denied,* 80 Hawai‘i 187, 907 P.2d 773 (1995). *See also State v. Agrabante,* 73 Haw. 179, 198, 830 P.2d 492, 502 (1992) (stating that "the nature of the alleged misconduct, the promptness or lack of a curative instruction, and the strength or weakness of the evidence against defendant" is considered

THE INTERPRETER: When [Defendant] went—when he saw the three of them, he get mad [sic].
Q. Why was he mad?
THE INTERPRETER: The reason he's mad is because Ray Ubias went Venus [sic] get pregnant [sic], he was just being taken care of [sic] as a diligent father.

in determining whether the alleged prosecutorial misconduct reached the level of reversible error).

We examine each alleged instance of misconduct.

## A.

The prosecutor's remark in his opening statement that "Defendant will do anything to stay out of trouble with the law except follow it" was improper argument. We agree that it was error not to sustain Defendant's objection to it.

"An opening statement merely provides an opportunity for counsel to advise an outline for the jury, the facts and questions in the matter before them." *State v. Simpson,* 64 Haw. 363, 369, 641 P.2d 320, 324 (1982) (citations omitted). *See also State v. Greyson,* 70 Haw. 227, 232 n. 4, 768 P.2d 759, 762 n. 4 (1989). Hence, "[t]he purpose of an opening statement is to explain the case to the jury and [to] outline the proof. It is not an occasion for argument." 8A J. Moore, *Moore's Federal Practice (Moore's )* ¶ 29.1.06, at 29.1–76 (2d ed. 1996).

Ordinarily, "the scope and extent of the opening statement is left to the sound discretion of the trial judge." *Id.* However, the trial court should "exclude irrelevant facts and stop argument if it occurs." *Id.* The State should only refer in the opening statement to evidence that it has "a genuine good-faith belief" will be produced at trial. *Greyson,* 70 Haw. at 232 n. 4, 768 P.2d at 762 n. 4. If improper remarks are made during the opening statement, "[t]he test for determining the existence of prosecutorial misconduct in [the] opening statement is whether the improper remarks prejudicially affected the defendant's substantive rights." *Moore's, supra,* ¶ 29.1.06, at 29.1–77.

Q. Okay. Was there any other reason why he's mad at Ray?
THE INTERPRETER: According to him he found out later that it was Ray whose [sic] giving drugs to Venus.

## B.

■ Defendant next alleges that the trial court erred in permitting the prosecutor to assert his personal knowledge in questions of the percipient witnesses. We agree that this was also error.

■ The prosecutor's assertions of personal knowledge violated Disciplinary Rule (DR) 7-106(C)(3) of the Code of Professional Responsibility,[13] which provides that: "[i]n appearing in his [or her] professional capacity before a tribunal, a lawyer shall not ... (3) [a]ssert his [or her] personal knowledge of [the] facts in issue, except when testifying as a witness."

■ In *State v. Rulona*, 71 Haw. 127, 785 P.2d 615 (1990), the trial court permitted the prosecutor, over defense counsel's objection, to conduct a lengthy cross-examination about an alleged out-of-court conversation between the prosecutor and the witness.[14] The supreme court explained that, "[b]y asking the questions in this form, the [prosecutor] put before the jury her version of what was said in that conversation[,]" making the questions "an assertion of the [prosecutor's] personal knowledge of the facts in issue with respect to that conversation." *Id.* at 131–32, 785 P.2d at 617–18. The prosecutor's conduct resulted in a violation of DR 7-106(C)(3). *Id.* at 132, 785 P.2d at 617. The rule is intended to protect against the unfair influence a prosecutor's assertion may have on the fact finder.

The [*prosecutor in the instant case*] ... *is the representative not of an ordinary party to a controversy, but of a sovereign-* *ty whose obligation to govern impartially is as compelling as its obligation to govern at all;* and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, [the prosecutor] is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. [The prosecutor] may prosecute with earnestness and vigor—indeed, [the prosecutor] should do so. But, while [the prosecutor] may strike hard blows, [the prosecutor] is not at liberty to strike foul ones. It is as much [the prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

*It is fair to say that the average jury, in a greater or less[er] degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently,* improper suggestions, insinuations, and especially, *assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none.*

*Id.* at 133, 785 P.2d at 618 (emphases added) (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935)).

■ Here, the prosecutor questioned the percipient witnesses concerning statements made to him in his own office. The prosecutor "put before the jury [his] version of what was said" in the prior out-of-court conversations correcting[15] and contradicting[16] the

---

13. At the time of the trial in 1993, the Hawai'i Code of Professional Responsibility governed the prosecutor's conduct. In 1994, the Hawai'i Rules of Professional Conduct replaced the Code of Professional Responsibility.

14. The following is an example of the prosecutor's questioning in *State v. Rulona*, 71 Haw. 127, 131, 785 P.2d 615, 617 (1990):

Q. [(PROSECUTOR)] Okay. And do you remember indicating to me that it was a difficult situation—
A. [(WITNESS)] What's that?
Q. Isn't it true you did indicate to me that it was a difficult situation, that it was hard?
A. I can't remember.

15. The prosecutor corrected Ray as follows:

Q. [(PROSECUTOR)] So what did you say last week, that you want to testify or did you not?
A. [(RAY)] *I never say I don't want to testify.*
Q. *You said you didn't want to come and testify; right? In fact you said you didn't want to be in the room if Sanchez was in the room?* Isn't that what you said?
A. Yeah, because—
Q. *Because you're scared of him[,] right?*
A. *No.*
(Emphases added.)

16. The prosecutor questioned May as follows:

Q. [(PROSECUTOR)] Okay. And do you remember telling me that you wanted to correct a portion of what you had said before?

witnesses' testimonies. *See Rulona*, 71 Haw. at 132, 785 P.2d at 617–18. The obvious error of these questions is that the prosecutor was not a witness, and therefore, could not be examined as to the facts he asserted in the questions. The prosecutor " 'was guilty of suggesting by his questions that statements had been made to him personally out of court, in respect of which no proof was offered.' " *Id.* at 132, 785 P.2d at 617–18 (ellipsis omitted) (quoting *Berger*, 295 U.S. at 84, 55 S.Ct. at 631). Although the prosecutor indicated at trial that he could prove his assertions through the testimony of other persons present, the State makes no reference to the record on appeal where this was done. By repeatedly contesting the witnesses' trial testimonies with references to the prior conversations, the prosecuting attorney " 'overstepped the bounds of that propriety and fairness which should characterize the conduct of [a prosecutor] in the prosecution of a criminal offense . . . .' " *Id.* (quoting *Berger*, 295 U.S. at 84, 55 S.Ct. at 631).

## C.

Defendant asserts that the prosecutor attempted to "intimidate the witnesses by his physical conduct in standing so close to the witness." [17] Because defense counsel did not describe how close the prosecutor was standing to the witness or other circumstances surrounding the incident, we cannot determine whether the prosecutor's conduct

> A. [ (MAY) ] Right.
> ....
> Q. You said that part was true; right? And *you said it was true that your father had a gun?*
> A. *No, I didn't*—
> Q. It was true—
> A. No, I didn't say that it was true that my father had a gun.
> Q. You were given any opportunity to look at your statement; right?
> A. Right.
> Q. First *you told me you weren't going to come and testify. Isn't that what you told me?*
> A. *No, I didn't say that. I didn't say nothing about that. No, I did not.*
> ....
> Q. In fact when you came to my office I told you that you must come here because of the subpoena. Didn't I tell you that?
> A. Right.
> Q. *And didn't you tell me you did not want to come today?*
> A. *I said if I had a choice I wouldn't come.*
> Q. Yeah.
> A. *But I didn't say I didn't want to come.*
> Q. *Oh, you didn't.* All right.
> (Emphases added.)

The prosecutor also questioned Ray as follows:
> Q. [ (PROSECUTOR) ] A week ago you weren't afraid to come to this courtroom?
> A. [ (RAY) ] No.
> Q. Really. A week ago when you met me in my office *did you tell me you wanted to come and testify or you didn't want to come and testify?* What did you say? What did you say?
> ....
> A. What do you mean, what did I say?
> Q. Did you say you wanted to come and testify against Samuel Sanchez or you did not want to testify against Samuel Sanchez. What did you say?
> A. I say no.
> Q. You said you didn't want to come and testify?
> A. Yeah.

> Q. *Isn't it because you said you were afraid of him?*
> A. *No.*
> (Emphases added.)

The prosecutor examined Januaria as follows:
> Q. [ (PROSECUTOR) ] *I told you he was flying in; didn't I,* when we met? We met at my office?
> A. [ (JANUARIA) ] *No.*
> Q. Didn't you come to my office with me last week?
> A. Yeah.
> Q. Okay, and *I told you Billy Belue was coming in from Florida.*
> A. *No, you did not tell me he's coming in.* You did not tell me he's coming in with her.
> Q. *Didn't you ask me if Billy, if Billy was coming to testify at this trial?* Didn't you ask me that question?
> A. *No, no, I did not ask you.*
> (Emphases added.)

17. Defense counsel objected to the prosecutor's questioning of Ray as follows:

> [DEFENSE COUNSEL]: Your Honor, I'm going to ask that the Prosecution step back from the witness.
> ....
> [PROSECUTOR]: What's the objection? Is that an objection?
> THE COURT: What is the objection?
> [DEFENSE COUNSEL]: Your Honor, it's intimidating. There's no reason to be that close.
> ....
> [PROSECUTOR]: I'll get closer because I have—
> THE COURT: Approach the witness and let me know.
> [DEFENSE COUNSEL]: Okay.

did indeed constitute harassment of the witness. Thus, we find no error on this point.

### D.

Defendant argues that "the prosecution's method of questioning the witness was prejudicial[ ] because he asked compound questions and argued with the witnesses." The following exchange is cited by Defendant:

Q. [(PROSECUTOR)] You realize you're under oath right now. You know what it means to be under oath? Tell me what it means to be under oath?

A. [(RAY)] I don't understand what you saying [sic].

Q. *No, you understand what I'm saying.* What does it mean to be under oath? To tell the truth or are you telling me the lie?

A. Tell the truth.

Q. *You're telling me* the truth that you told the police officer—*that you didn't tell the police officer that you were threatened by [Defendant]* [?] You didn't tell the police that? So if the police officer walks in here and tells us different you told him that the police officer is writing [sic].

[DEFENSE COUNSEL]: Objection, argumentative.

[PROSECUTOR]: It's not argumentative.

THE COURT: Overruled.

(Emphases added.) Plainly, the prosecutor asked more than one question at a time before receiving an answer and argued with the witness.

We note that the trial transcript reflects several other instances where the prosecutor asked compound questions and appeared to be argumentative. For example:

Q. [(PROSECUTOR)] Okay, why don't you tell me what part is wrong? Did you make this statement to Detective Morioka?

A. [(Ray)] Yeah.

Q. Did you lie when you talked to Detective Morioka? Did you lie to him? *You did not lie to him. You told the truth.*

. . . .

Q. [(PROSECUTOR)] Did someone tell you from the time you left my office last week until today that it was against the law for your father to even hold a shotgun? Is that why your story's changed in the last week?

A. [(MAY)] No.

Q. *Because you recall being in last week and talking about, well, he never really pointed it, all he did was held it.* But since that time has somebody told you that that's not enough? That you have to say he never even owned it, never even held it?

A. *No.*

[DEFENSE COUNSEL]: Your Honor, objection. Is there a question coming out of this? It seems that [Prosecutor] is testifying.

[PROSECUTOR]: I'm asking if anybody's talked to her about the testimony.

THE COURT: Overruled.

(Emphases added.)

■ "Compound questions contain two or more questions and therefore court jury confusion when only one answer is given." A. Bowman, *Hawai'i Rules of Evidence Manual* § 12.2, at 409 (1st ed. 1990).

A compound question simultaneously poses more than one inquiry and calls for more than one answer. Such a question presents two problems. First, the question may be ambiguous because of its multiple facets and complexity. Second, any answer may be confusing because of uncertainty as to which part of the compound question the witness intended to address. 28 C. Wright & V. Gold, *Federal Practice and Procedure: Civil* § 6164, at 354 (footnote omitted).

■ An argumentative question is a "faulty form of examination of [a] witness by propounding a question which suggests [the] answer in a manner favorable to party who advances the question or which contains a statement in place of a question." *Black's Law Dictionary* 107 (6th ed. 1992).

A question is argumentative if its purpose, rather than to seek relevant fact, is to argue with the witness or to persuade the trier of fact to accept the examiner's in-

ferences. The argumentative question ... employs the witness as a springboard for assertions that are more appropriate in summation. There is a good deal of discretion here because the line between argumentativeness and legitimate cross-examination is not a bright one. Argumentative questions often tend to harass witnesses[.]

A. Bowman, *Hawai'i Rules of Evidence Manual* § 12.2, at 408 (1st ed. 1990).

 In this case, we agree that the prosecutor employed compound and argumentative questions. Ordinarily, a reviewing court will not reverse a conviction or grant a new trial for the use of compound or argumentative questions unless they resulted in prejudice to the accused. The use of compound questions must amount to prejudice.[18] *United States v. Cohen*, 583 F.2d 1030, 1044 (8th Cir.1978) (holding that, viewing the record as a whole, the compound questions asked were not prejudicial when the appellant "was given full opportunity" to "clarify" the points). Similarly, when weighing the effect of argumentative questions posed by the prosecutor, the appellate court must determine whether the trial court's error in refusing to sustain objections to the questions was prejudicial. *State v. Savory*, 893 S.W.2d 408, 411 (Mo.Ct.App.1995). *See also*

*Carroll v. State*, 438 N.E.2d 745, 750 (Ind. 1982) (upholding conviction where the appellant "failed to demonstrate how he was prejudiced by the supposedly argumentative question" because the appellant shoulders the burden to "show how his substantial rights were prejudiced"); *Burns v. State*, 88 Nev. 215, 495 P.2d 602, 604 (1972) (stating that although the district attorney's "questions were argumentative and the district judge properly sustained defense counsel's objections," the failure of the judge to admonish the jury to disregard the exchange does not constitute reversible error).

### E.

Defendant complains that in final argument, the prosecutor improperly argued that the prosecutor and the jury were "the victims"[19] of the firearm charge, that an acquittal would mean that Defendant and the witnesses had "fooled [the] jury,"[20] and that had the percipient witnesses been truthful at trial, Defendant would have acknowledged that they were "finally" telling the truth.[21] We believe these remarks were improper.

Guidelines for prosecutorial argument are succinctly presented in the ABA Standards for Criminal Justice:

---

**18.** The confusion caused by a compound question may be easily solved:

> Where a compound question has been posed, the court may require that its component questions be posed separately. Where a compound question has been posed and answered, the court may require that the answer be clarified so as to eliminate confusion. However, where the answer's content or context makes its meaning clear, no such clarification is needed. Further, even where there is confusion, the court has discretion under [Federal] Rule 611(a) to deny objections on the ground that the objecting party has the opportunity to clarify matters on cross-examination.

28 C. Wright & V. Gold, *Federal Practice and Procedure: Civil* § 6164, at 354 (footnote omitted). HRE Rule 611 mirrors Fed.R.Evid. 611.

**19.** The first statement involved was as follows:

> You know the felon in possession charges. People of the County of Maui, they're the victims of that. Don't you acquit him on those. No matter what you think of Ray or May or Venus. Don't acquit him on those. Everybody in this County are the victims in that one. You

don't let felons have firearms. No, No, No. We're all the victims on that one.

**20.** The second statement complained of was as follows:

> Do not, do not reward their lies with an acquittal. Please do not. That's what you're doing. You know what happens after that, then the group gets together again and they say, boy, it worked. We sure fooled that jury didn't we? No, they didn't. . . .

**21.** The final remark Defendant challenges stated the following:

> Did any of you detect any remorse from any of those people who said they lied before? Are they really just pissed off for having to be here? Did anybody say, Daddy, sorry, Daddy I lied before.
>
> And did [Defendant] look over and say, oh gosh, I glad they finally telling the truth. No. No. The script just kind of went along. Kind of (inaudible). I didn't see anybody, May or Venus have all this guilt inside for holding in these lies for four months and now coming in and saying, damn, we going to tell the truth.

Standard 3–5.8 Argument to the jury

(a) The prosecutor may argue all reasonable inferences from evidence in the record. It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw.

(b) It is unprofessional conduct for the prosecutor to express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant.

(c) The *prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury.*

(d) The *prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict.*

(e) It is the responsibility of the court to ensure that final argument to the jury is kept within proper, accepted bounds.

(Emphases added.) 1 ABA Standards for Criminal Justice, The Prosecution Function (*ABA Standards*), Standard 3–5.8 (2d ed. 1986). "Prosecutorial conduct in argument is a matter of special concern because of the possibility that the jury will give special weight to the prosecutor's arguments, not only because of the prestige associated with the prosecutor's office but also because of the fact-finding facilities presumably available to the office." Commentary to Standard 3–5.8(b), *ABA Standards, supra.*

### 1.

■■■ The prosecutor's argument that "[e]verybody in this County are [sic] the victims" and that "[w]e're all the victims"[22] injected issues "broader than the guilt or innocence of the accused under the control-

ling law" into the case. *See* Standard 3–5.8(d), *ABA Standards, supra.*

The instant argument is akin to the one considered in *State v. Apilando*, 79 Hawai'i 128, 900 P.2d 135 (1995). There, the prosecutor requested the jury to "'send a message to the defendant that his actions were wrong, they're not to be tolerated by this community.'" *Id.* at 142, 900 P.2d at 149. While the Hawai'i Supreme Court did not reach the question of whether the prosecutor's improper remark rose to the level necessary to constitute reversible error, the court did "hold that the prosecutor's plea that the jury send a message to the defendant that his conduct would not be tolerated by the community was improper." *Id.* at 143, 900 P.2d 135. The argument here was similar, and thus, improper.

### 2.

■■■ The prosecutor argued that in the event of an acquittal, Defendant and the percipient witnesses would "get[] together again and they [sic] say, boy, it worked. We sure fooled that jury, didn't we?" Defendant contends that this argument was "outside the evidence at trial" and was an "emotional appeal" to the "passions and prejudices of the jurors." This argument improperly "direct[ed] the jury from its duty to decide the case on the evidence ... by making predictions of the consequences of the jury's verdict." Standard 3–5.8(d), *ABA Standards, supra.* The prosecutor here argued, in effect, that an acquittal would brand the jury members as "fools." This argument undermines the proposition that the prosecutor should refrain from argument diverting the jury from concentrating on the evidence.

### 3.

■■■ Defendant asserts as error the prosecutor's argument that, had the witnesses

---

**22.** By including himself in the use of the term "we," the prosecutor made an improper personal assertion of the kind rejected in *State v. Marsh*, 68 Haw. 659, 660, 728 P.2d 1301, 1302 (1986). Courts in other jurisdictions, however, have upheld use of the term "we" as a permissible comment on the prevalence of crime in the community and as a plea for law enforcement. *See, e.g., State v. Carson*, 883 S.W.2d 534, 536 (Mo.Ct.App.

1994) (holding that "a prosecutor may comment on the prevalence of crime in the community and the personal safety of its inhabitants" in closing argument; *Fisher v. State*, 681 S.W.2d 202, 207–08 (Tex.Ct.App.1984) (stating that the prosecutor's statements were "within the permissible area of jury argument because it [was] a plea for law enforcement").

been truthful at trial, Defendant would have "look[ed] over [at the percipient witnesses] and [said,] oh, gosh, I glad they finally telling the truth[.]" Defendant claims that this remark constituted a "comment upon the Defendant's failure to comment upon the fact that his witnesses were finally telling the truth, when no such question had been asked of the witness." It is not clear from the record that it was possible for Defendant, while in the courtroom, to have "look[ed] over" to the percipient witnesses and said to the jury "I [sic] glad they [sic] finally telling the truth" in the absence of any question put to him. But plainly, it would be "unprofessional conduct for the prosecutor intentionally to refer to or argue on the basis of facts outside the record." Standard 3–5.9, *ABA Standards, supra.*

In any event, the prosecutor improperly expressed his personal view as to the credibility of the witnesses when he said, "*I* didn't see anybody, May or Venus have all this guilt inside for holding in these lies for four months and now coming in and saying, damn, we going [sic] to tell the truth[.]" (Emphasis added.) *See* DR 7–106(C)(4).[23]

■ "Prosecutors are ... bound to refrain from expressing their personal views as to a defendant's guilt or credibility of witnesses." *State v. Marsh,* 68 Haw. 659, 660, 728 P.2d 1301, 1302 (1986). The prosecutor in *Marsh* repeatedly stated her personal opinion in closing argument by using the personal pronoun "I" and also expressed on at least nine occasions her belief that defense witnesses had lied. *Id.* at 660, 728 P.2d at 1302. Because the "pivotal issue was the credibility of the witnesses[,]" the *Marsh* court concluded that the "prosecutor's improper comments, taken as a whole, substantially prejudiced [Defendant's] right to a fair trial." *Id.* at 661, 728 P.2d at 1302. The prosecutor's conduct in the instant case falls squarely within the conduct rejected in *Marsh.* Here, the prosecutor asserted his *personal* evaluation of the credibility of certain witnesses in final argument.

### 4.

Defense counsel did not object to any of the comments in the prosecutor's closing argument that Defendant now appeals. It was error not to do so, but under our disposition of the case, we need not reach the question of whether these comments alone, would require reversal.

### F.

In view of the multiple instances of improper comments and questions by the prosecutor, we cannot conclude beyond a reasonable doubt that the prosecutor's conduct would not have influenced the jury's verdict. *State v. Toro,* 77 Hawai'i 340, 347, 884 P.2d 403, 410 (App.) *cert. denied,* 77 Hawai'i 489, 889 P.2d 66 (1994). *Holbron,* 80 Hawai'i 27, 904 P.2d 912; *Suka,* 79 Hawai'i at 301, 901 P.2d at 1280. We believe the cumulative effect of the prosecutor's misconduct was to deny Defendant a fair trial. *See Marsh,* 68 Haw. at 661, 728 P.2d at 1302. Consequently, for the reasons stated in Part III, *supra,* and in this part, we hold that the terroristic threatening charge must be remanded for a new trial.

### V.

■ Based on our remand, we need not decide Defendant's claims that the court (1) failed to "articulate a factual basis for imposing an extended term of imprisonment" and (2) "erred by penalizing [Defendant] for the lies of his accusers." We only emphasize that findings of fact as opposed to conclusory statements are necessary to support a court's determination that Defendant's extended term was "necessary for the protection of the public"[24] under HRS § 706–662(4), and that

---

**23.** Disciplinary Rule (DR) 7–106(C)(4) of the Code of Professional Responsibility states that "a lawyer shall not ... [a]ssert his [or her] personal opinion ... as to the credibility of a witness[.]"

**24.** The supreme court outlined the two-step process that a trial court must follow when imposing an extended term of imprisonment under HRS § 706–662 in *State v. Huelsman,* 60 Haw. 71, 588

P.2d 394 (1978), *reh'g denied,* 60 Haw. 308, 588 P.2d 394 (1979). "The first step involves a finding by the court that the defendant is within the class of offenders to which the particular subsection applies." *Id.* at 76, 588 P.2d at 398. Defendant does not contest the court's finding that he was a multiple offender. In the second step of the process, "the court must determine ... that

Defendant cannot be punished for the alleged crimes of his accusers.[25]

## VI.

For the foregoing reasons, we reverse the convictions under HRS § 134–7(b), vacate the conviction under HRS § 707–716(1)(d) for terroristic threatening, vacate the sentences, and remand the case for a new trial on the terroristic threatening charge only.

the defendant's commitment for an extended term is necessary for the protection of the public." *Id.* at 77, 588 P.2d at 398. *Huelsman* mandated the following procedure for the sentencing courts:

> the sentencing court shall state on the record its reasons for determining that commitment of the defendant for an extended term is necessary for the protection of the public and shall enter into the record all findings of fact which are necessary to its decision. The record in each such case shall include the presentence report and all evidence considered by the sentencing court.

*Id.* at 92, 588 P.2d at 407. The *Huelsman* court vacated and remanded the extended sentences it reviewed, on the ground that the judge

> did not provide any statement of the facts upon which he relied, and provided only a conclusory finding, in each case, that "the evidence shows beyond a reasonable doubt that the defendant is a multiple offender whose criminali-

ty is so extensive that a sentence of imprisonment for an extended term is warranted as required under Section 662(4) of the Hawaii Penal Code."

*Id.* at 75, 588 P.2d at 398 (footnote added).

**25.** In *State v. Nunes*, 72 Haw. 521, 824 P.2d 837 (1992), the supreme court held that the trial court "unconstitutionally punished the defendant for an uncharged crime" because "the sentencing guideline fixed a sentence based on a finding that the 'victim lied for the defendant' and the court based its sentencing on that factor alone[.]" *Id.* at 526, 824 P.2d at 840. The *Nunes* court found "nothing in the record to support the judge's conclusion that the victim actually lied for the defendant" except for the conflicting statements that the victim made to police and subsequently at trial. *Id.* at 525, 824 P.2d 837.